PACIFIC LEGAL FOUNDATION, et al.,
Plaintiffs-Appellants,

v.

Cecil B. ANDRUS, et al.,
Defendants-Appellees.

No. 79–1451.

United States Court of Appeals,
Sixth Circuit.

Argued April 1, 1981.

Decided Aug. 19, 1981.

830

Ronald A. Zumbrun, Sacramento, Cal., Raymond M. Momboisse, Sam Kazman, Washington, D. C., Lon P. MacFarland, Columbia, Tenn., for plaintiffs-appellants.

Hal D. Hardin, U. S. Atty., Nashville, Tenn., David B. Cannon, Jr., Nancy B. Firestone, Land and Natural Resources Div., Dept. of Justice, Washington, D. C., for defendants-appellees.

Before EDWARDS, Chief Judge, KENNEDY, Circuit Judge, and NEWBLATT, District Judge.*

CORNELIA G. KENNEDY, Circuit Judge.

This is an appeal from a judgment of the District Court holding that the National Environmental Policy Act, 42 U.S.C.A. § 4321 et seq. (NEPA), does not require the United States Fish and Wildlife Service (FWS) to file an environmental impact statement (sometimes referred to as an EIS) before listing a species as an endangered species pursuant to the Endangered Species Act, 16 U.S.C. § 1531 et seq. (ESA). We affirm.

Contracts were signed in 1971 for construction by the Tennessee Valley Authority (TVA) of two dams in the Duck River to control the water level and flooding and to provide electricity and recreational areas. One dam has been completed and the other, the Columbia Dam, is almost finished. In 1973, the Endangered Species Act was passed which gave the Secretary of the Interior the authority to list all species which were endangered or threatened. See 16 U.S.C. § 1533. At that time, once the listing was made, all federal agencies were to consult with the Secretary and insure their actions did not jeopardize the existence of an endangered species or result in the destruction or modification of the habitat of such species. See 16 U.S.C.A. § 1536 (1974).[1] Pursuant to authority delegated to it by the Secretary of the Interior, FWS, after notice in the Federal Register and opportunity for comment, on June 14, 1976, listed 159 taxa of animals as endangered. See 41 Fed.Reg. 24062 (June 14, 1976). Among those listed were six species of mollusks found in the Duck River.[2] A seventh mussel found in the Duck River, the tan riffle shell (Epioblasma walkeri), was listed as endangered August 23, 1977. See 42 Fed.Reg. 42351 (Aug. 23, 1977). No critical habitat for any of these mussels was determined. No challenge was made to FWS' rulemaking. On February 16, 1977, FWS issued a biological opinion letter stating that completion of the Columbia Dam project would jeopardize the existence of two of the mussel species. See Defendants' Exhibit 23. Thereafter, construction on the dam was stopped.

The Pacific Legal Foundation and several residents of Tennessee sued, claiming FWS violated NEPA because it did not file an impact statement before listing the seven mussels as endangered. They prayed for an injunction to remove the seven species from the list, to prevent FWS from enforcing the ESA, and to prevent FWS from listing any other species found in the Duck or Clinch Rivers until FWS had complied with NEPA.

The District Court held that Pacific Legal Foundation had no standing to sue as none of its members lived in the area. The court held that the listing of the species was a major federal action affecting thousands of lives and many millions of dollars (if the dam could not be completed) and thus was within the scope of NEPA. However, it held that an impact statement was not required because FWS could not consider environmental factors when contemplating what species should be listed. Pacific Legal Foundation and the other plaintiffs appealed.

Appellants argue that NEPA applies to a listing of an endangered species. They claim there is no express or implied exemption from NEPA's application as there are no time pressures on the agency before it acts. ESA does not require a statement

---

* Honorable Stewart A. Newblatt, United States District Judge for the Eastern District of Michigan, sitting by designation.

1. Since then, this section of ESA has been amended to provide for an exemption procedure. See 16 U.S.C.A. § 1536 (1981 Supp.).

2. The six species are: Birdwing pearly mussel (Conradilla caelata); Yellow-blossom pearly mussel (Epioblasma (-Dysnomia) florentina); Turgid-blossom pearly mussel (Epioblasma (-Dysnomia) turgidula); Orange-footed pimpleback (Plethobasis cooperianus); Cumberland monkeyface pearly mussel (Quadrula intermedia); and Pale Lilliput pearly mussel (Toxolasma (-Carunculina) cylindrella).

which would serve as a functional equivalent, and FWS did not make express findings to support a decision that NEPA did not apply. FWS did make environmental assessments and determined that impact statements were not necessary, but appellants claim these negative declarations did not specifically consider the impact of listing the mussels and were not supported by the evidence, as the evidence shows several of the species have not been sighted in the area for many years. Finally, appellants argue Pacific Legal Foundation had standing as its informational interests—its function is to inform others—were harmed.

The government (representing FWS and the Department of the Interior) argues that as the Secretary had no authority under ESA to consider the environmental concerns of NEPA, it could not have complied and thus was impliedly exempt. It argued that to the fullest possible extent it did comply as interested parties did have notice and an opportunity to comment before the final rulemaking. *See* 16 U.S.C.A. § 1533(f) (1974). It argues that requiring an impact statement would defeat the purpose of ESA as the species could not be protected while the statement was being prepared and may be destroyed in the meanwhile. It further argues that any equitable relief would not be appropriate without joining TVA as an indispensable party as compliance with ESA rests with TVA as the acting federal agency.

Appellants respond that the impact statement serves to educate Congress and the public as well as the agency and, therefore, that the agency cannot consider the environmental questions of NEPA does not excuse it from filing an impact statement. They dismiss any requirement that TVA needs to be joined as an indispensable party. If the species are not listed, it matters not who is responsible for enforcing ESA.

Several ancillary issues are raised which, if meritorious, might have prevented this Court from reaching the main issue. We conclude, however, that none of these issues precludes consideration of the main question.

*Mootness*

■ In its brief and at oral argument, the government disclosed that TVA and FWS have successfully reached an agreement whereby TVA has agreed to transplant the mussels before completing and filling the dam. If the dam was satisfactorily completed without destruction of the species, then there would be no potential violation of ESA and appellants' prayer for relief would be moot. However, the agreement reached, as described by the government, requires the successful transplantation of the mussels. Nothing in the record before this Court indicates that this has been done and that the dam has been completed. Therefore, this case cannot be considered moot.

*Standing of Pacific Legal Foundation*

The District Court below found Pacific Legal Foundation had no standing. However, all the plaintiffs have appealed and those with standing raised the same issues as Pacific Legal Foundation. Indeed, Pacific's brief on appeal was submitted on behalf of all the appellants. Thus, this Court need not reach the question whether or not Pacific Legal Foundation has standing to protect its informational interests.

*Substantial Evidence Supporting the Environmental Assessments*

■ FWS determined, based upon its environmental assessments, that the listings of the species were not major federal actions significantly affecting the environment and thus impact statements were not required. Appellants argue that the environmental assessments were not based on substantial evidence and were arbitrary as they did not specifically address the consequences of listing the seven mussels and because some of the mussels have not been seen for years.

This Court need not consider whether or not FWS' assessments were based on substantial evidence. The District Court held that the listings were major federal actions and this holding is not challenged on appeal. Therefore, FWS' negative declarations and

the assessments upon which those declarations were based are irrelevant. Further, FWS determined that the species were endangered (rather than extinct) in rulemaking procedures which were subject to the Administrative Procedure Act. *See* 16 U.S.C. § 1533(f)(1). Such rulemaking may be reviewed to determine if it was arbitrary and capricious. *See* 5 U.S.C. § 706. No review of rulemaking was requested by appellants. They cannot now collaterally attack the rulemaking as unsupported by substantial evidence. *Cf. Anaconda Co. v. Ruckelshaus*, 482 F.2d 1301, 1306 (10th Cir. 1973) (EPA required to balance costs and environmental factors of proposed standards for emissions under the Clean Air Act; if administrative hearing is mere formality, should seek review of decision in reviewing court rather than collaterally attacking).

*TVA as Indispensable Party*

The government contends that equitable relief is impossible to grant because TVA is an indispensable party. Rule 19(a), Fed.R.Civ.Pro., states that a party shall be joined as a party if in his absence complete relief cannot be accorded among those already parties. However, the injunction prayed for is against FWS listing the species involved here or any other species or taking any action to use ESA to protect the seven mussels until an impact statement is filed. The court could grant all the relief requested without involving TVA. Thus, we agree with the District Court that TVA is not an indispensable party.

*Requirement of Filing an Impact Statement*

Section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2), requires "to the fullest extent possible," that "all agencies of the Federal Government" shall—

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

The language "to the fullest extent possible" is not intended to be a loophole. Each agency is expected to comply unless there is a statutory conflict with the agency's authorizing legislation that expressly prohibits or makes full compliance impossible. *See* H.R.Conf.Rep.No.91–765, 91st Cong., 1st Sess. (1969), *reprinted in* [1969] U.S.Code Cong. & Admin.News 2767, 2770; *Flint Ridge Development Co. v. Scenic Rivers Assn. of Oklahoma*, 426 U.S. 776, 787–88, 96 S.Ct. 2430, 2437–2438, 49 L.Ed.2d 205 (1976); *Texas Committee on Natural Resources v. Bergland*, 573 F.2d 201, 206 (5th Cir. 1978); *State of Louisiana v. FPC*, 503 F.2d 844, 874–75 (5th Cir. 1974); *Davis v. Morton*, 469 F.2d 593, 598 (10th Cir. 1972); *Calvert Cliffs' Coordinating Committee, Inc. v. U.S. Atomic Energy Comm'n*, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1115 (D.C. Cir. 1971).

The government argues that NEPA and ESA are in conflict because under ESA, the Secretary must list all species which are endangered according to the factors listed in ESA. ESA does not leave any room for considering the factors which must be evaluated in an impact statement. Appellants argue that the Secretary or FWS could still file an impact statement even though the duty to list under ESA is mandatory and not discretionary. ESA does not prevent such a statement from being made. Appellants argue there is no express exemption and no implied exemption due to a timetable problem or the requirement of filing a similar statement under ESA which would be the functional equivalent of an impact

statement. Finally, appellants argue, the Secretary should file an impact statement when species are listed as that would inform Congress, the President, and the public about the environmental impact.

The Supreme Court was presented with two arguments for an implied exemption from NEPA in *Flint Ridge, supra.* The issue in that case was whether or not the Department of Housing and Urban Development had to file an impact statement before allowing a disclosure letter filed by a private developer to become effective. HUD argued it did not as, first, it had only limited discretion and no power to consider environmental concerns and, second, it had to act within 30 days or the disclosure letter automatically became effective and this time-table made compliance with NEPA impossible. The Court found preparation of the impact statement inconsistent with HUD's statutory duties because of the time constraint and did not reach the first argument. *See* 426 U.S. at 787–91, 96 S.Ct. at 2437–2439.

In the present case, the Endangered Species Act did not provide for an express exemption from the requirements of filing an impact statement under NEPA. Compare, in contrast, the Federal Water Pollution Control Act, 33 U.S.C. § 1371(c)(1), which provides that no action taken under that chapter shall be major federal action

within the meaning of NEPA. Nor is there a time constraint in the present case. No provision of ESA provides that action must be taken by a certain date before a species may be listed. ESA did provide that the Secretary had to institute rulemaking procedures within 120 days of promulgating an emergency regulation, *see* 16 U.S.C.A. § 1533(f)(2)(B)(ii) (1974), but the emergency procedures were not used in the present case. Thus, cases which found statutory conflict with NEPA due to time constraints and the necessity of acting expeditiously are distinguishable from the present case,[3] and this Court must face the issue left open by the Supreme Court in *Flint Ridge.*

Another exception has been applied by lower courts to exempt the Administrator of the Environmental Protection Agency (EPA) from the requirement of filing an impact statement when promulgating standards under the Clean Air Act. This exception has been dubbed the "functional equivalent" exception—EPA was exempt from filing an impact statement because the Clean Air Act itself requires EPA to consider and balance the environmental impact, the costs, and the alternatives; to give opportunity for public comment; and to publish the results of the decisionmaking. Thus, the Clean Air Act serves the purposes of NEPA and filing an impact statement is not required.[4]

---

3. For cases where NEPA was inapplicable because of time constraints, see *Consolidated Edison Co. of New York, Inc. v. FPC*, 168 U.S.App.D.C. 92, 512 F.2d 1332, 1346 (D.C.Cir.1975); *American Smelting & Refining Co. v. FPC*, 161 U.S.App.D.C. 6, 494 F.2d 925, 948 (D.C.Cir.), *cert. denied*, 419 U.S. 882, 95 S.Ct. 148, 42 L.Ed.2d 122 (1974); *Portland Cement Ass'n v. Ruckelshaus*, 158 U.S.App.D.C. 308, 486 F.2d 375, 380 (D.C.Cir.1973), *cert. denied*, 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974); *Dry Color Manufacturers' Ass'n v. Department of Labor*, 486 F.2d 98, 108 (3d Cir. 1973); *Gulf Oil Corp. v. Simon*, 373 F.Supp. 1102, 1104–05 (D.D.C.), *aff'd*, 502 F.2d 1154, 1156–57 (Em.Ct. App.1974) (per curiam); *Natural Resources Defense Council, Inc. v. TVA*, 367 F.Supp. 122, 125–26 (E.D.Tenn.1973), *aff'd*, 502 F.2d 852 (6th Cir. 1974) (per curiam).

4. *See State of Wyoming v. Hathaway*, 525 F.2d 66, 71–72 (10th Cir. 1975), *cert. denied*, 426 U.S. 906, 96 S.Ct. 2226, 48 L.Ed.2d 830 (1976);

*Indiana & Michigan Electric Co. v. EPA*, 509 F.2d 839, 843 (7th Cir. 1975); *Essex Chemical Corp. v. Ruckelshaus*, 158 U.S.App.D.C. 360, 486 F.2d 427, 431 (D.C.Cir.1973), *cert. denied*, 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974); *Portland Cement Ass'n v. Ruckelshaus*, 158 U.S.App.D.C. 308, 486 F.2d 375, 384–85 (D.C.Cir.1973), *cert. denied*, 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974); *Appalachian Power Co. v. EPA*, 477 F.2d 495, 508 (4th Cir. 1973); *Getty Oil Co. (Eastern Operations) v. Ruckelshaus*, 467 F.2d 349, 359 (3d Cir. 1972), *cert. denied*, 409 U.S. 1125, 93 S.Ct. 937, 35 L.Ed.2d 256 (1973).

Appellants argue that for the functional equivalent exception to apply, the authorizing statute must require consideration of all that NEPA requires. One case from the District of Columbia Circuit did hold that the functional equivalent applied as EPA did consider all five core issues of the impact statement. *See Environmental Defense Fund, Inc. v. EPA*, 160 U.S.

The Endangered Species Act provides for notice of proposed rulemaking listing the endangered species and provides opportunity for public comment, *see* 16 U.S.C. § 1533(f), but at the time the seven mussels were listed, the Act did not provide for consideration of environmental, economic, or other consequences of the listing or of the determination of a critical habitat. The Secretary was required to use the best scientific and commercial data available to him, *see* 16 U.S.C.A. § 1533(b)(1) (1974), and listing of a species depended upon finding one of five factors.

(a)(1) The Secretary shall by regulation determine whether any species is an endangered species or a threatened species because of any of the following factors:

(1) the present or threatened destruction, modification, or curtailment of its habitat or range;

(2) overutilization for commercial, sporting, scientific or educational purposes;

(3) disease or predation;

(4) the inadequacy of existing regulatory mechanisms; or

(5) other natural or manmade factors affecting its continued existence.

16 U.S.C.A. § 1533(a)(1) (1974). The Act was amended in 1978 to provide that the Secretary shall determine the critical habitat at the same time a species is listed and that the Secretary shall consider the economic effects of the determination of a critical habitat and publish an evaluation of any activities which may harm the critical habitat or be impacted by the designation. The standards for determination of which species should be listed as endangered was unchanged. The requirement of designating a critical habitat does not apply to any species listed prior to November 10, 1978.

*See* 16 U.S.C.A. § 1533(a) (1981 Supp.). Thus, while ESA may now provide the functional equivalent of an impact statement when a critical habitat is designated—a question this Court need not reach here—ESA did not provide a functional equivalent of an impact statement with respect to listing a species at the time the seven mussels involved here were listed.

■ In short, the Secretary cannot rely upon either the time-constraint or the functional-equivalent exceptions for finding a statutory conflict with NEPA which would relieve the agency of its duty to file an impact statement when a species is listed as endangered. Nonetheless, this Court holds, for the reasons stated below, that NEPA does conflict with the agency's authorizing statute, ESA, and thus an impact statement is not required when a species is listed as endangered or threatened.

First, filing an impact statement does not and cannot serve the purposes of the Endangered Species Act. The purposes of the Act are to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, to provide a program for conservation, and to achieve the purposes of the treaties and conventions signed with foreign countries to conserve various species. *See* 16 U.S.C. § 1531(b). The Secretary is required to list whether any species is endangered or threatened based on the five factors provided in ESA. The Secretary does not have the discretion to consider the five factors required to be considered in filing an impact statement. NEPA supplements the existing goals of agencies and provides that agencies should also consider environmental concerns. *See State of Louisiana v. FPC, supra,* 503 F.2d at 876; *Calvert Cliffs, supra,* 449 F.2d at 1112–13; 42

App.D.C. 123, 489 F.2d 1247, 1256 (D.C.Cir. 1973). However, that same court later stated that the functional equivalent exception does not require EPA to go through all the motions involved in filing an impact statement. Rather, the functional equivalent test recognizes that the Clean Air Act itself provides for orderly consideration of diverse environmental factors.

*See Amoco Oil Co. v. EPA,* 163 U.S.App.D.C. 162, 501 F.2d 722, 750 (D.C.Cir.1974).

Since these cases cited above were decided, Congress enacted an express exemption from NEPA's requirement of filing an impact statement for the EPA acting pursuant to the Clean Air Act. *See* 15 U.S.C.A. § 793(c) (1976).

U.S.C. § 4335.[5]   However, nothing in § 102 of NEPA, 42 U.S.C. § 4332, shall affect the specific statutory obligations of any federal agency to comply with criteria or standards of environmental quality.   *See* 42 U.S.C. § 4334.   The Supreme Court has held that NEPA was not intended to repeal by implication any other statute and thereby create powers not created in the agency's enabling legislation.   *See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 548, 98 S.Ct. 1197, 1213, 55 L.Ed.2d 460 (1978);   *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 692–94, 93 S.Ct. 2405, 2418–2419, 37 L.Ed.2d 254 (1973).

Second, filing an impact statement in the present case would not serve the purposes for filing such a statement.   NEPA is primarily a procedural statute to insure that an agency considers the environmental impact.   The impact statement is evidence that environmental concerns were considered by the agency.[6]   The legislators referred to the provisions of NEPA requiring an impact statement be filed as an "action-forcing" provision, to require agencies to consider the environmental impact.[7]   But the statutory mandate of ESA prevents the Secretary from considering the environmental impact when listing a species as endangered or threatened.   The Secretary is limited to using the best scientific and commercial data on the five factors listed in the statute.   *See* 16 U.S.C.A. § 1533(b)(1).   The impact statement cannot insure the agency made an informed decision and considered environmental factors where the agency has no authority to consider environmental factors.   As far as the determination to list a species is concerned, preparing an impact statement is a waste of time.   Appellants suggest that the impact statement would have indicated that several of the mussels had not been seen for years in the Duck River.   Perhaps so, but the best scientific data on the existence and whereabouts of the species—which the Secretary must consider under ESA—should already have indicated that fact.   If the Secretary has not relied upon the best available data, the solution would be judicial review of the rule-

---

5.   The House bill did not have a provision for requiring all federal agencies contemplating proposals to file an impact statement.   *See* H.R.Rep.No.91–378, 91st Cong., 1st Sess., (1969), *reprinted in* [1969] U.S.Code Cong. & Admin.News 2751, 2759–61.   Representative Aspinall introduced an amendment during floor debates proposing that nothing in the Act changes the authority given to existing agencies created by existing law.   Before the House passed the bill, he reiterated that nothing in the bill changed the existing authority and responsibility of legislators.   If the agencies needed more discretion to comply with the bill, more legislation would be needed.   *See* 115 Cong. Rec. 26587, 26589 (Sept. 23, 1969).

The conference bill conformed to the Senate bill and included the provisions for an impact statement and that authority created by the bill was supplemental to existing authority.   *See* S.Rep.No.91–296, 91st Cong., 1st Sess. 2, 7, 14 (July 9, 1969), H.R.Conf.Rep.No.91–765, 91st Cong., 1st Sess. (1969), *reprinted in* [1969] U.S. Code Cong. & Admin.News 2767, 2769, 2771; 115 Cong.Rec. 40417 (Dec. 20, 1969).

Mr. Aspinall was disappointed and signed the Conference Report but refused to sign the statement of the managers on the part of the House.   He insisted, contrary to the signed statement, that agencies were not given supplemental authority by the bill, but had to review existing authority and recommend further leg-

islation if existing authority was too limited.   *See* 115 Cong.Rec. 40926–27 (Dec. 22, 1969).   The clear language of the statute, however, indicates Representative Aspinall lost this argument.

6.   *See Vermont Yankee, supra*, 435 U.S. at 558, 98 S.Ct. at 1219;   *Aberdeen & Rockfish Railroad Co. v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 422 U.S. 289, 319, 95 S.Ct. 2336, 2355, 45 L.Ed.2d 191 (1975);   *State of Wyoming v. Hathaway*, 525 F.2d 66, 71 (10th Cir. 1975), *cert. denied*, 426 U.S. 906, 96 S.Ct. 2226, 48 L.Ed.2d 830 (1976);   *Swain v. Brinegar*, 517 F.2d 766, 775 (7th Cir. 1975);   *Sierra Club v. Morton*, 510, F.2d 813, 818 (5th Cir. 1975);   *State of Louisiana v. FPC, supra*, 503 F.2d at 875;   *Monroe County Conservation Council, Inc. v. Volpe*, 472 F.2d 693, 697 (2d Cir. 1972);   *Environmental Defense Fund, Inc. v. Corps of Engineers of U.S. Army*, 470 F.2d 289, 295 (9th Cir. 1972), *cert. denied*, 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160 (1973);   *City of Boston v. Volpe*, 464 F.2d 254, 257 (1st Cir. 1972);   *National Helium Corp. v. Morton*, 455 F.2d 650, 656 (10th Cir. 1971).

7.   *See* S.Rep.No.91–296, 91st Cong., 1st Sess. 9 (1969);   115 Cong.Rec. 40416 (Dec. 20, 1969) (Sen. Jackson) (debate on conference bill).

making, not collateral attack to require an impact statement. *See Anaconda Co., supra*, 482 F.2d at 1306.

Third, the Secretary's action in listing species as endangered or threatened furthers the purposes of NEPA even though no impact statement is filed. The purposes of NEPA are to declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote prevention or elimination of damage to the environment and stimulate the health and welfare of man; to enrich the understanding of ecological systems and natural resources; and to establish a Council on Environmental Quality. *See* 42 U.S.C. § 4321. In the congressional declaration of policy, Congress recognized the "profound impact of man's activity on the interrelations of all components of the natural environment"; that each person should enjoy a healthful environment; and that each person has a responsibility to contribute to the preservation and enhancement of the environment. *See* 42 U.S.C. §§ 4331(a), 4331(c). The responsibilities of federal agencies were to serve as trustees of the environment for the next generation; to assure a safe, healthful, productive environment; to attain the widest range of beneficial uses without degradation or risk to health or safety; to preserve natural aspects of our national heritage; to achieve a balance between population and resource use; and to enhance the quality of renewable resources and recycle depletable resources. *See* 42 U.S.C. § 4331(b). The legislative history also indicates the purpose of NEPA was to provide a mechanism to enhance or improve the environment and prevent further irreparable damage.[8] The Secretary, by listing species, is working to preserve the environment and prevent the irretrievable loss of a natural resource. The Secretary thereby enhances the ability to learn about ecosystems and acts as a responsible trustee of the environment. One of the rationales for exempting the actions of EPA under the Clean Air Act from NEPA was that EPA was working to preserve and enhance the environment and thus served the purposes of NEPA. To require EPA to file an impact statement would only hinder its efforts at attaining the goal of improving the environment.[9] That same rationale applies to actions of the Secretary of the Interior when he lists species as endangered or threatened—in such action, the Secretary is charged solely with protecting the environment.

Appellants also suggest that filing a statement would serve the purposes of NEPA by informing others even if the Secretary cannot use the information. They argue the impact statements are to inform the executive branch, Congress, and the public about the impact of the listing of species. Some courts have stated that one purpose of NEPA is to inform Congress, the Executive, and the public about the environmental consequences. *See Trout Unlimited v. Morton*, 509 F.2d 1276, 1282 (9th Cir. 1974); *Iowa Citizens for Environmental Quality, Inc. v. Volpe*, 487 F.2d 849, 851 (8th Cir. 1973); *Jones v. Lynn*, 477 F.2d 885, 891

8. *See* S.Rep.No.91–296, 91st Cong., 1st Sess. 4, 5, 8; 115 Cong.Rec. 19009 (July 10, 1969) (Sen. Jackson) (purpose of Senate bill is to show intention not to irreparably damage life on earth); 115 Cong.Rec. 26572 (Sept. 23, 1969) (Rep. Dingell) (goal of House bill is to change environment for the better); 115 Cong.Rec. 40416 (Dec. 20, 1969) (Sen. Jackson) ("conservation-environmental measure") (conference bill indicates "we will not intentionally initiate actions which will do irreparable damage to the air, land, and water which support life on earth"); *id.* at 40417; *id.* at 40422 (must use "stand-point of prevention"); 115 Cong.Rec. 40926 (Dec. 22, 1969) (Rep. Garmatz); *id.* at 40927 (Rep. Galifianakis) ("restoration of environmental quality").

9. *See Anaconda Co. v. Ruckelshaus*, 482 F.2d 1301, 1306 (10th Cir. 1973); *Buckeye Power, Inc. v. EPA*, 481 F.2d 162, 174 (6th Cir. 1973); *Duquesne Light Co. v. EPA*, 481 F.2d 1, 9 (3d Cir. 1973), *vacated and remanded to dismiss as moot sub nom. EPA v. St. Joe Minerals Corp.*, 425 U.S. 987, 96 S.Ct. 2196, 48 L.Ed.2d 812 (1976); *International Harvester Co. v. Ruckelshaus*, 155 U.S.App.D.C. 411, 478 F.2d 615, 650 n. 130 (D.C.Cir.1973); *Appalachian Power Co. v. EPA*, 477 F.2d 495, 508 (4th Cir. 1973). *But see Texas Committee, supra*, 573 F.2d at 208 (no exemption for Forest Service's decision to allow clear cutting as Forest Service not solely charged with protecting the environment).

(1st Cir. 1973); *Natural Resources Defense Council, Inc. v. Morton*, 148 U.S.App.D.C. 5, 458 F.2d 827, 833 (D.C.Cir.1972). But this purpose does not exist independent of the primary purpose to insure an informed decision by the agency contemplating federal action—rather this purpose is an added benefit derivative of the primary purpose. As stated by the court in *Iowa Citizens, supra*, the impact statement provides the basis for critical *evaluation* of the agency action by those not associated with the agency. *See* 487 F.2d at 851. If the agency cannot consider the environmental impact, an impact statement is useless to the agency in evaluating its action. Congress has already determined that preserving species which are endangered or threatened is to be given the highest priority. *See TVA v. Hill*, 437 U.S. 153, 174, 98 S.Ct. 2279, 2291, 57 L.Ed.2d 117 (1978).[10] An impact statement is not necessary to evaluate the priority the Secretary is to give to listing species as Congress has already done it. The impact statement would not in the present situation serve the functions it was designed to serve. This Court is reluctant to make NEPA more of an obstructionist tactic to prevent environ-

ment-enhancing action than it may already have become.

A similar rationale has been used in an analogous case to exempt the Department of Health, Education, and Welfare from the requirement of filing an impact statement. *See Milo Community Hospital v. Weinberger*, 525 F.2d 144, 147 (1st Cir. 1975). The issue there was whether or not HEW had to file an impact statement before terminating a hospital's federally assisted status. Under the Medicare Act, HEW had limited discretion. The environmental concerns of NEPA could not have changed the Secretary's decision. If the Secretary found noncompliance with fire prevention requirements, the Secretary had a statutory duty to terminate the hospital's status.

Support for this Court's position may also be found in the legislative history of NEPA. Though not without ambiguity, the legislative history suggests that NEPA was not intended to be applied to agencies whose function was to protect the environment.[11] The legislative history of the Endangered Species Act of 1973 made no mention of NEPA or its requirements, although the history suggests that the duty to list species was considered a mandatory duty, not a

10. The legislative history of the 1978 Amendments to ESA indicates the legislators thought the Supreme Court decision in the snail darter case (*TVA v. Hill*) was correct. *See* 124 Cong. Rec. S10894 (daily ed. July 17, 1978) (Sen. Culver); *id.* at S10909 (Sen. Stennis); *id.* at S11017 (daily ed. July 18, 1978) (Sen. Garn); *id.* at H12872 (daily ed. Oct. 14, 1978) (Rep. Jeffords). *But see* 124 Cong.Rec. S11128 (daily ed. July 19, 1978) (Sen. Garn).

11. One senator emphatically stated that only the Conference Report represented the views of the conferees as that was the only document signed and the only thing being voted upon. He reserved the right to object to any statement made by the Chair of the Committee. *See* 115 Cong.Rec. 40422 (Dec. 20, 1969). However, as the debate continued, the position was clearly expressed that § 102, which required an impact statement, among other things, was not intended to change the authority and operations of environment-enhancing agencies. Their legislative mandates were not changed in any way by the bill. The conference bill was agreed to without any contrary opinion being expressed. *See* 115 Cong.Rec. 40423–24, 40425, 40427 (Dec. 20, 1969).

A similar opinion was expressed by Representative Dingell to the House during debates on the conference bill. Said he: Many existing agencies already have important responsibilities in the area of environmental control. The provisions of §§ 102 and 103 of the bill "are not designed to result in any change in the manner in which they carry out their environmental protection authority." 115 Cong.Rec. 40925 (Dec. 22, 1969). Again, a supporter of the bill reiterated that only the Conference Report was agreed to, not the statement of the manager. But he raised no objection to Dingell's position that the bill did not apply to environment-enhancement agencies. *Id.* at 40926–27 (Rep. Aspinall). One opponent predicted the bill would apply to everybody—congressional committees, every agency, every program—and urged hesitation. He would have had the bill laid over until January. *Id.* at 40928 (Rep. Harsha). The conference bill was agreed to despite his dire prediction. *Id.* One can only assume the majority did not believe him or did not believe the problem was serious. Because of the other comments made by supporters, this Court concludes Congress did not intent to have NEPA apply to environment-enhancing agencies.

discretionary one.[12] Although subsequent legislative history does not necessarily prove what an earlier legislature intended, if the legislative history of a provision is ambiguous, the court may look to subsequent legislative history. *See Ryan v. Ohio Edison Co.*, 611 F.2d 1170, 1175 (6th Cir. 1979). The legislative history of the 1978 amendments to ESA indicates that Congress in 1978 thought the Act of 1973 created a mandatory duty to list endangered species. More flexibility was thought necessary and Congress responded by creating a committee to consider exemptions and requiring the Secretary to consider economic and other factors when designating a critical habitat. Despite the urgings of witnesses to require an impact statement before listing, this was not translated into legislative provision; no change was made in the mandatory duty to list endangered or threatened species.[13] Viewing all the legis-

---

**12.** The legislative history of the Endangered Species Act of 1973 is very sparse—no mention was made of NEPA or its requirements. Witnesses in hearings and congressional reports indicated the purpose of the Act was to prevent further extinction of the world's species and thereby prevent further damage to the environment. *See Endangered Species: Hearings on H.R. 37 Before the Subcomm. on Fisheries and Wildlife Conservation and the Environment of the House Comm. on Merchant Marine and Fisheries*, 93d Cong., 1st Sess. 252 (March 15, 26, 27, 1973) (Miss Wilson); *id.* at 307 (Mr. Seater); H.R.Rep.No.93–412, 93rd Cong., 1st Sess. 4–5 (1973) (best interest to minimize losses of genetic variations); S.Rep.No.93–307, 93d Cong., 1st Sess. (1973), *reprinted in* [1973] U.S. Code Cong. & Admin.News 2989, 2990; 119 Cong.Rec. 25668, 25682 (July 24, 1973) (Sen. Tunnley); 119 Cong.Rec. 30167 (Sept. 18, 1973) (Rep. Clausen).

Testimony of witnesses at the hearings suggested all endangered species should be listed and protected. *See 1973 Hearings, supra*, at 256–57 (Ms. Stevens); *id.* at 307 (Mr. Seater). The House Report commented that the Secretary's decision to list would be based on a combination of listed events, based on the best available evidence. The section was drawn broadly to allow the Secretary to declare a species as endangered or threatened for any legitimate reason. H.R.Rep.No.93–412, *supra*, at 11. The Senate Report also allowed the Secretary to list a species as endangered as a result of five listed factors. S.Rep.No.93–307, *supra*, [1973] U.S.Code Cong. & Admin.News at 2996. That the factors for consideration were listed is evidence the Secretary was limited to considering those factors. Further evidence may be found in the floor debates of the Senate. An amendment was proposed and passed to allow the Secretary not to list an insect as endangered if the insect posed a significant risk to man. Without the amendment, the Secretary would have had no discretion not to list the insect if it became endangered or threatened. *See* 119 Cong.Rec. 25678 (July 24, 1973). This Court concludes Congress intended the Secretary to have a mandatory duty to list species which are endangered or threatened based on the factors listed in the Endangered Species Act.

**13.** Hearings were held in the Senate on the proposed bill. The bill did not contain any provision for considering economic impact of designating a critical habitat. One witness indicated the Act as it stood did not give the Secretary any discretion—any endangered species must be listed. *See Amending the Endangered Species Act of 1973: Hearings on S.2899 Before the Subcomm. on Resource Protection of the Senate Comm. on Environmental and Public Works*, 95th Cong., 2d Sess. 223 (April 13, 14, 1978) (Kenneth Balcomb). The Secretary was criticized for not listing some species due to political concerns. *See id.* at 249 (Pacific Legal Foundation). Others deplored the inflexibility of the Act and stated not all endangered species should be listed. *See id.* at 38–39, 43 (Mr. Hart); *id.* at 45 (Rep. Garn).

Some, including the Pacific Legal Foundation, asserted that more flexibility was needed and that the Secretary ought to be required to file an impact statement under NEPA before listing a species or designating a critical habitat. *See id.* at 221 (Mr. Thompson); *id.* at 224, 227 (Mr. Balcomb); *id.* at 248, 249, 252 (Pacific Legal Foundation); *id.* at 392–93 (Duck River Agency). However, some witnesses, including some of those advocating that an impact statement should be required, thought the listing process should be speeded up. *See id.* at 34 (Mr. Greenwalt); *id.* at 222 (Mr. Thompson); *id.* at 239 (Mr. Kane). Senators Culver and Hodges were reluctant to "play God" and determine which species should be listed and which not, and some witnesses agreed. *See id.* at 34 (Mr. Greenwalt); *id.* at 39–40, 42 (Sen. Culver); *id.* at 74 (Mr. Bean); *id.* at 226, 227 (Sen. Hodges).

In any event, the Senate report contained no provision for considering economic consequences of designating a critical habitat or requiring an impact statement before listing a species, although the need for greater flexibility was recognized. The committee created, not the Secretary, would balance other factors as it considered applications for exemptions. *See* S.Rep.No.95–874, 95th Cong., 2d Sess. 3, 7, 10 (1978). The bill also did not contain an express exemption from NEPA for the listing of a species as it did for the actions of the committee. *See 1978 Hearings, supra*, at 12.

lative history of both acts, this Court concludes that Congress intended listing of a species as endangered or threatened to be a mandatory act dependent upon the five factors found in ESA and not upon environmental impact concerns found in NEPA and that Congress did not intend to require the Secretary to file an environmental impact statement before listing a species as endangered or threatened under ESA.

█ As a final argument against upholding the decision below, appellants argue that the Secretary is not entitled to an exemption from NEPA in this case because the Secretary did not present a statement of reasons why filing an impact statement was not necessary. A number of courts have held that an agency must give reasons for not filing an impact statement. *See Asphalt Roofing Manufacturers Ass'n v. ICC*, 186 U.S.App.D.C. 1, 567 F.2d 994, 1005 (D.C.Cir.1977); *Nucleus of Chicago Homeowners Ass'n v. Lynn*, 524 F.2d 225, 231 (7th Cir. 1975), *cert. denied*, 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976); *American Smelting and Refining Co. v. FPC*, 161 U.S. App.D.C. 6, 494 F.2d 925, 948 (D.C.Cir.), *cert. denied*, 419 U.S. 882, 95 S.Ct. 148, 42

During the Senate debates, the rigidity of the Act was noted. But the solution proposed was a committee to grant exemptions, not a change in the mandatory duty to list. *See* 124 Cong. Rec. S10894 (daily ed. July 17, 1978) (Sen. Culver); *id.* at S10908 (Sen. Stennis); *id.* at S11020 (daily ed. July 18, 1978) (Sen. McClure) (listing is a scientific judgment).

Senator McClure noted that the decision of critical habitat did not allow any balancing. *See id.* at S11020 (daily ed. July 18, 1978). He introduced an amendment to allow the Secretary to consider economic factors before designating a critical habitat. His amendment would also have required the Secretary to file an impact statement before designating a critical habitat. *See id.* at S11143 (daily ed. July 19, 1978). Objection was raised because perhaps not every designation of critical habitat would be major federal action. Senator McClure withdrew his amendment with the understanding that the present law, without the amendment, did not forbid preparing an impact statement. ESA would remain silent and the application of NEPA to designation of critical habitat would depend on whether the specific designation was major federal action. *See id.* at S11144–45. Senator Garn introduced a substitute amendment which would also have required the Secretary to consider economic factors of a designation of critical habitat. *See* 124 Cong.Rec. S11120, 11128 (daily ed. July 19, 1978). This proposed amendment was also withdrawn. *Id.* at S11130.

An amendment, which was agreed to, did require any agency to file an impact statement before seeking an exemption from the committee. *See id.* at S11025–26 (daily ed. July 18, 1978). No such provision was passed by the Senate with respect to listing a species.

During the discussion in the House, Representative Dingell stated that his primary objective when he authorized the ESA was the protection of *all* species threatened, but a compromise was proposed because some thought ESA was too inflexible. *See* 124 Cong.Rec. H12871–72 (daily ed. Oct. 14, 1978). The House bill contained a provision that the Secretary consider economic and other relevant effects when designating a critical habitat, rather than purely biological considerations, as the 1973 Act provided. *See* H.R.Rep.No.95–1625, 95th Cong., 2d Sess. (1978), *reprinted in* [1978] U.S. Code Cong. & Admin.News 9453, 9460, 9466, 9467; 124 Cong.Rec. H12868–69 (daily ed. Oct. 14, 1978) (Rep. Bowen); *id.* at H12877 (House bill § 2(2)). The provision was extended by amendment from the floor to include the designation of critical habitat for any animal, not just invertebrates, *see id.* at H12872, H12898 (daily ed. Oct. 14, 1978) (Rep. Buchanan). No such provision was proposed with respect to listing a species. Indeed, both Houses criticized the Secretary for failing to list endangered species because of political concerns or concerns about the effect on existing projects. *See* H.R.Rep.No.95–1625, *supra*, [1978] U.S. Code Cong. & Admin.News at 9463; 124 Cong. Rec. S10894 (daily ed. July 17, 1978) (Sen. Culver); *id.* at S11127 (daily ed. July 19, 1978) (Sen. Garn); *id.* at H12870 (daily ed. Oct. 14, 1978) (Rep. Beard).

The House added specific exemptions for the Tellico Dam project and Grayrocks project, *see id.* at H12884, 12890–93 (daily ed. Oct. 14, 1978), but no exemption was proposed for the Columbia Dam project although the problem was presented. *See* H.R.Rep.No.95–1625, *supra*, [1978] U.S.Code Cong. & Admin.News at 9463; 124 Cong.Rec. at H12870 (daily ed. Oct. 14, 1978) (Rep. Beard).

The Conference Report basically conformed to the House bill with respect to provisions on critical habitat and exemptions. *See* H.R.Cong. Rep.No.95–1804, 95th Cong., 2d Sess. (1978), *reprinted in* [1978] U.S.Code Cong. & Admin. News 9484, 9492–93; 124 Cong.Rec. H13579 (daily ed. Oct. 14, 1978) (Rep. Murphy). It was passed without further reference to the discretion or duties of the Secretary with respect to listing a species. *See* 124 Cong.Rec. S19161–67 (daily ed. Oct. 14, 1978); *id.* at H13579–80 (daily ed. Oct. 14, 1978).

L.Ed.2d 122 (1974); *Maryland-National Capital Park and Planning Comm'n v. United States Postal Service*, 487 F.2d 1029, 1039 (D.C.Cir.1973); *Arizona Public Service Co. v. FPC*, 483 F.2d 1275, 1282 (D.C.Cir. 1973); *Scientists' Institute for Public Information, Inc. v. Atomic Energy Commission*, 156 U.S.App.D.C. 395, 481 F.2d 1079, 1095 (D.C.Cir.1973). But the decision that an impact statement is not required in the present case is based on a pure question of law—namely, that a statutory conflict exists between ESA and NEPA which relieves the Secretary of the burden to prepare an impact statement before listing any species as endangered or threatened. The purpose of requiring a statement of reasons is to evaluate whether the agency's decision is arbitrary and whether or not it is supported. *See Save the Bay, Inc. v. United States Corps of Engineers*, 610 F.2d 322, 325 (5th Cir. 1980); *Scientists' Institute, supra*, 481 F.2d at 1095. That purpose is not served by requiring a statement of reasons where as a matter of law an impact statement is not required. The failure to specify the reason for not preparing an impact statement does not preclude the Secretary from claiming the exemption in this case. *See, e. g., State of Wyoming, supra*, 525 F.2d 66, holding that EPA was exempt from NEPA's requirement of filing an impact statement but making no mention whether or not EPA gave a statement of reasons why the impact statement was not filed.

The judgment of the District Court is affirmed.

GEORGE CLIFTON EDWARDS, Jr., Chief Judge, concurring.

I join in the ultimate decision arrived at by the court—namely affirmance of the judgment of the District Court.