**DOUGLAS COUNTY, Plaintiff,**

**v.**

**Manuel LUJAN, Defendant.**

**Civ. No. 91–6423–HO.**

United States District Court,
D. Oregon.

Dec. 22, 1992.

Ronald S. Yockim, Cegavske & Associates, Roseburg, OR, for Douglas County Oregon.

Thomas C. Lee, U.S. Attorneys Office, Portland, OR, Jean E. Williams, U.S. Dept. of Justice, Environmental & Natural Resources Div., Wildlife and Marine Resources Section, Washington, DC, for Manuel Lujan, Jr.

James H. Boldt, Gloria M. Roy, Josephine County Counsel Office, Grants Pass, OR, for Josephine County.

David R. Ris, Coos County Counsel, Coquille, OR, for Coos County.

Reginald R. Davis, Klamath County Counsel, Klamath Falls, OR, for Klamath County Oregon.

Derek C. Johnson, Johnson Clifton Larson & Bolin, Eugene, OR, Victor M. Sher, Sierra Club Legal Defense, Seattle, WA, for Headwaters, Inc.

Derek C. Johnson, Johnson Clifton Larson & Bolin, Eugene, OR, Victor M. Sher, Sierra Club Legal Defense, Seattle, WA, for Umpqua Valley Audubon Soc.

Scott W. Horngren, Haglund & Kirtley, Portland, OR, Steven P. Quarles, Thomas R. Lundquist, Claire S. Brier, Crowell & Moring, Washington, DC, for Northwest Forest Resource Council.

Scott W. Horngren, Haglund & Kirtley, Portland, OR, Steven P. Quarles, Thomas R. Lundquist, Claire S. Brier, Crowell & Moring, Washington, DC, for Douglas Timber Operators, Southern Forest Products Ass'n, Southern Timber Purchasers Council and American Forest Resource Alliance.

## ORDER

HOGAN, District Judge.

Plaintiff Douglas County filed this action for declaratory judgment and injunctive relief challenging defendant's failure to prepare an environmental impact statement (EIS) relative to designating critical habitat for the Northern Spotted Owl. Plaintiff and defendant have filed cross motions for summary judgment (# 15, # 60). Intervenor plaintiffs Coos County and Josephine County also seek summary judgment (# 36, # 41).[1]

## FACTS

On June 26, 1990, the United States Fish and Wildlife Service (FWS) listed the Northern Spotted Owl as a threatened species pursuant to the Endangered Species Act (ESA), 16 U.S.C. § 1531, et seq. See 55 Fed.Reg. 26,114 (June 26, 1990). ESA requires "to the maximum extent prudent and determinable," critical habitat to be designated concurrently with the listing of a species. 16 U.S.C. § 1533(a)(3)(A). In its final rule listing the Northern Spotted Owl as threatened, FWS found that critical habitat was not determinable at that time. The failure to designate critical habitat was challenged in federal court and FWS was ordered to publish a proposed critical habitat designation by April 30, 1991, and to publish a final designation rule "at the earliest possible time permitted under the appropriate regulations." Northern Spotted Owl v. Lujan, 758 F.Supp. 621, 629–630 (W.D.Wash.1991).

On May 6, 1991, FWS published a proposed rule designating approximately 11,602 acres of public and private land within Oregon, Washington, and California as critical habitat. 56 Fed.Reg. 20,816 (May 6, 1991), Memorandum in Support of Defendant's Motion for Summary Judgment (# 62), Exhibit 3. Part of the proposed rule stated: "The Service has determined that an Environmental Assessment, as defined under the authority of the National Environmental Policy Act of 1969, need not be prepared in connection with regulations adopted pursuant to section 4(a) of the Act." 56 Fed.Reg., supra at 20,824. The Secretary is required to designate habitat "on the basis of the best scientific data available" and to take "into consideration the economic impact, and any other relevant impact, of specifying any particular area as critical habitat." 16 U.S.C. § 1533(b)(2). In arriving at the May 6, 1991 proposed designation, FWS relied in part on a preliminary economic analysis it previously prepared. Memorandum in Support of Defendant's Motion for Summary Judgment (# 62), Exhibit 2. FWS acknowl-

---

1. Even though there are intervenor plaintiffs, this order refers to plaintiff in the singular.

edged that it would need to conduct further study and consider additional data, including public comments, prior to publishing the final designation. 56 Fed.Reg., *supra* at 20,821.

On May 15, 1991, Douglas County filed a "Notice of Intent to File Citizens Suit Under Sec 11(g) of the Endangered Species Act for Failure to Abide by the National Environmental Protection Act." *See* Memorandum in Support of Motion for Summary Judgment (# 19), Exhibit A.

As part of the rule-making process, FWS requested comments from the general public relative to the critical habitat proposal. On May 30, 1991, plaintiff submitted formal comments to the Secretary, stating that the Secretary had failed to comply with NEPA requirements by not exploring a range of alternatives to the proposed action.

Plaintiff requested the assistance of United States Senator Robert Packwood to determine the status of plaintiff's notice of intent to file citizen suit. On August 5, 1991, FWS sent Senator Packwood a letter stating "(t)he Service believes that, under the reasoning of [the *Pacific Legal Foundation v. Andrus*] decision, preparing an EIS on the proposed critical habitat designation would not further the goals of NEPA or the Act." Memorandum in Support of Motion for Summary Judgment (# 19), Exhibit B.

After the comment period closed on the proposed designation, FWS prepared a second economic analysis report which reviewed a range of economic impacts including an analysis of employment and revenue loss in the timber industry in each county in the affected states. Memorandum in Support of Defendant's Motion for Summary Judgment (# 62), Exhibit 5, pp. 19–25, and Tables 9–11.

On the basis of the second report, comments received on the first proposed designation and other data and analysis, FWS published a revised proposed rule in which 8,240,160 acres were proposed as critical habitat. 56 Fed.Reg. 40002, (August 13, 1991), Memorandum in Support of Defendant's Motion for Summary Judgment (# 62), Exhibit 6. In the revised proposed designation, FWS excluded all private, tribal, and some state lands and revised some of the critical habitat units. In the second proposed rule, FWS affirmed its determination that an Environmental Assessment (EA) was not required.

The primary reason FWS published two proposed designations was to allow additional review and consideration of the economic impact of critical habitat designation and to permit full opportunity for public comment. 56 Fed.Reg. 20,822. Memorandum in Support of Defendant's Motion for Summary Judgment (# 62), Exhibit 3.

FWS held another 60 day comment period following the publication of the revised proposed designation and continued to conduct further analysis of economic impact of the designation. FWS published a final "Economic Analysis of Critical Habitat Designation Effects for the Northern Spotted Owl" in January, 1992. *See* Memorandum in Support of Defendant's Motion for Summary Judgment (# 62), Exhibit 7.

On January 15, 1992, FWS published its final rule designating Northern Spotted Owl critical habitat. 57 Fed.Reg. 1796 (Jan. 15, 1992). Memorandum in Support of Defendant's Motion for Summary Judgment (# 62), Exhibit 8. The final designation includes approximately 6.9 million acres. All state, private, tribal, and other non-federal lands are excluded. As with the previous proposed rules, the final rule stated that FWS had determined that it was not required to prepare an EA in conjunction with the designation. "A notice outlining the Service's reasons for this determination was published in the Federal Register on October 25, 1983 (48 FR 49244)." *Id.*, 57 Fed.Reg. 1833.

FWS premised its conclusion that an EA was not necessary in conjunction with the designation primarily on the reasoning in a Sixth Circuit opinion and a letter received from the Council on Environmental Quality (CEQ). The Sixth Circuit opinion holds that, as a matter of law, FWS is exempt from the NEPA requirement to prepare an EIS prior to listing decisions under ESA.

*Pacific Legal Foundation v. Andrus*, 657 F.2d 829 (6th Cir.1981).

The letter from CEQ, "whose interpretation of NEPA is entitled to substantial deference," *Andrus v. Sierra Club*, 442 U.S. 347, 358, 99 S.Ct. 2335, 2341, 60 L.Ed.2d 943 (1979), urged FWS to cease preparing EAs prior to making ESA listing decisions. *See* Memorandum in Support of Motion for Summary Judgment (# 19), Exhibit C.

On September 25, 1991, Douglas County filed this action alleging four claims. Plaintiff's first claim alleges that FWS violated NEPA by failing to develop a range of alternatives to the final Northern Spotted Owl critical habitat designation; plaintiff's second claim alleges that FWS violated NEPA by failing to identify and disclose the cumulative impact of the final Northern Spotted Owl critical habitat designation in conjunction with other connected actions; plaintiff's third claim alleges FWS violated NEPA and ESA by failing to consider other relevant impacts of designating critical habitat; and, plaintiff's fourth claim alleges FWS violated NEPA and ESA by failing to consider the social and economic impacts of designating a particular area as critical habitat. Complaint (# 1), pp. 6–9.

Plaintiff seeks a declaratory judgment that defendant violated NEPA and ESA and an injunction prohibiting defendant from taking any action to designate critical habitat for the Northern Spotted Owl until an EIS or EA is prepared. *Id.*, p. 9.

## ESA CLAIMS

■ Plaintiff's third and fourth claims for relief are based on alleged violations of both NEPA and ESA. The NEPA portion of those claims is based on FWS's alleged failure to consider various impacts of the Northern Spotted Owl critical habitat designation and is logically subsumed within plaintiff's second (NEPA) claim. Therefore, I will address plaintiff's third and fourth claims under ESA separately and address the NEPA portion of those claims, to the extent necessary, below.

*Endangered Species Act Claims:*

Defendant moves the court for summary judgment on plaintiff's third and fourth claims under ESA. *See* Defendant's Memorandum in Support of Defendant's Motion for Summary Judgment (# 62), pp. 30–34. Plaintiff responded that it had standing to assert ESA claims but did not respond to defendant's arguments on the merits. *See* Plaintiffs' Brief in Opposition (# 68), pp. 13–14. Plaintiff's memorandum in support of the motion for summary judgment (# 19) only discusses the claims under NEPA.

If a moving party satisfies the initial burden of demonstrating the absence of a material and triable issue of fact, the burden shifts to the opposing party, who must present probative evidence tending to support its claim or defense. *Intel Corp. v. Hartford Acc. and Indem. Co.*, 952 F.2d 1551 (9th Cir.1991). In this case, plaintiff has not controverted the facts asserted by defendant regarding plaintiff's ESA claims.

Plaintiff's third claim for relief asserts that FWS "fail[ed] to consider impacts of designating critical habitat upon wildlife species which utilize forest habitat other than the northern spotted owl (i.e., deer, elk)." Complaint (# 1), p. 8. However, the record reflects that FWS did consider whether the proposed designation of critical habitat would impact other species such as deer and elk and stated a rational basis for its conclusion that the critical habitat designation would not negatively impact those species. *See* 56 Fed.Reg., *supra* at p. 40,028 [service response to Issue 38].

Plaintiff's fourth claim alleges that FWS did not consider "the social and economic impacts of designating Douglas County as critical habitat ... prior to proposing the specific areas within the county as critical habitat." Complaint (# 1), p. 9.

The record reflects that FWS prepared an analysis of the economic impacts of designation for publication in conjunction with the proposed rule prior to each proposed designation. *See* Memorandum in Support of Defendant's Motion for Summary Judgment (# 62), Exhibits 2 and 5. The second proposed designation was published for the purpose of considering economic impacts in greater detail than was accomplished with

the original revised proposal. 56 Fed.Reg., *supra* at 20,822. The second report examined economic impacts on a county by county basis in each of the affected states. *See* Memorandum in Support of Defendant's Motion for Summary Judgment (# 62), Exhibit 5, Tables 9–11. FWS reviewed county level employment impacts and revenue sharing impacts with calculations of the employment and revenue losses. FWS also developed and implemented a four step process to examine whether any critical habitat area should be excluded because the benefits of exclusion outweighed the benefits of inclusion. Memorandum in Support of Defendant's Motion for Summary Judgment (# 62), Exhibit 4, p. 1.

With regard to each impacted county, FWS considered the economic impacts, anticipated future harvest, owl factors, and other benefits and proposed a decision on exclusion. *See e.g., Id.*, at B–9—B–11 (considering each factor with respect to Douglas County).

In summary, the administrative record in this case reveals that FWS adequately considered relevant economic issues associated with critical habitat designation and particularly those of employment and revenue loss due to decreased federal timber sales. Plaintiff was afforded an opportunity to respond to both FWS's economic analysis and FWS's balancing process.

Based on the foregoing, I find that FWS took a "hard look" at the impacts in question. *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976), and conducted a "reasonably thorough discussion" of the effects at issue. *Trout Unlimited v. Morton,* 509 F.2d 1276, 1283 (9th Cir.1974). *See also, Marble Mountain Audubon Soc. v. Rice,* 914 F.2d 179 (9th Cir.1990).

Defendant's motion for summary judgment on plaintiff's third and fourth claims for relief under ESA is allowed.[2]

**NEPA CLAIMS**

*Standing:*

■ Article III of the United States Constitution limits the jurisdiction of federal courts to actions involving an actual "case" or "controversy," a limitation that manifests itself, in part, through the doctrine of standing. *Secretary of State v. Joseph H. Munson Co.,* 467 U.S. 947, 954, 104 S.Ct. 2839, 2845, 81 L.Ed.2d 786 (1984); *Ripplinger v. Collins,* 868 F.2d 1043, 1047 (9th Cir.1989).

■ To invoke the jurisdiction of the court so as to satisfy the standing requirements of Article III, plaintiff must demonstrate that it has (1) sustained a personal injury, (2) that is fairly traceable to defendant's allegedly unlawful conduct, and (3) that its requested relief is likely to redress the alleged injury. *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984); *Ripplinger v. Collins, supra* at 1047.

■ The standing requirements plaintiff must satisfy to obtain the judicial review it seeks in this action do not end with those imposed by Article III. Plaintiff must also demonstrate that its claims are within the zone of interest sought to be protected by the statute which forms the basis of its claims. This requirement is imposed with regard to plaintiff's NEPA claims, because plaintiff seeks judicial review of those claims under the Administrative Procedure Act (APA), 5 U.S.C. § 702. Plaintiff must rely on section 702, because NEPA does not contain a provision granting rights to judicial review of agency decisions allegedly reached in violation of its procedural requirements.

Section 702 requires plaintiffs seeking judicial review of agency actions to demonstrate that they have suffered legal wrong or have been adversely affected or aggrieved "within the meaning of the relevant statute." 5 U.S.C. § 702.

2. Because I find that defendant is entitled to prevail on the merits of these claims, it is not necessary to address defendant's argument that plaintiff lacks standing to pursue its third claim for relief under ESA.

■ Therefore, standing requirements as applied to NEPA cases include an injury which is arguably within the zone of interest to be protected or regulated by the statute that plaintiff claims the agency violated. *Lujan v. National Wildlife Federation,* 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990); *Port of Astoria v. Hodel,* 595 F.2d 467 (9th Cir.1979).

■ Defendant contends that plaintiff does not have standing to assert NEPA claims in this case, because it "avers no specific and concrete injury cognizable under NEPA." Reply Memorandum in Support of Defendant's Motion for Summary Judgment (#72), p. 3. Plaintiff argues that it will suffer injury to a variety of proprietary, environmental, economic, and procedural interests as a result of defendant's failure to comply with NEPA.

Defendant contends, however, that "Plaintiff has stated no injury that is not *economic* when closely examined," and that injury to economic interests are not within the zone of interest of NEPA. *Id.*

I find that plaintiff's claims are within the zone of environmental and procedural interests protected by NEPA and, therefore, that plaintiff has the requisite standing to bring this action.

I am not persuaded by defendant's argument that all of plaintiff's alleged injuries are in essence injuries to economic interests. Plaintiff has an environmental interest in managing the fish and wildlife within its boundaries. The affidavit of Troy Reinhart, submitted in support of plaintiff's motion for summary judgment (#15), indicates a potential environmental injury to species on the Umpqua National Forest with habitat needs different from those of the Northern Spotted Owl.

In addition, I find that NEPA's concern with the "quality of the human environment," 42 U.S.C. § 4332(2)(C), is not as restrictive as urged by defendant. As noted in *Trinity Episcopal School Corp. v. Romney,* 523 F.2d 88, 93 (2nd Cir.1975):

"The National Environmental Policy Act contains no exhaustive list of so-called environmental considerations but without question its aims extend beyond water and air pollution (citation omitted). The Act must be construed to include protection of the quality of life of city residents. Noise, traffic, overburdened mass transportation systems, crime, congestion and even the availability of drugs all affect the urban 'environment' ..."

In *County of Josephine v. Watt,* 539 F.Supp. 696, 704 (N.D.Calif.1982), county and lumber companies who sought to protect their individual financial interests, but also the quality of life and public interest of their geographic region were afforded standing under NEPA.

In this case, plaintiff has presented evidence which establishes that defendant's designation of critical habitat will profoundly affect the quality of life in Douglas County, and thus has established an environmental injury sufficient to establish standing under NEPA.

■ In addition, plaintiff has standing based upon injury to procedural interests under NEPA. The failure to follow procedures designed to ensure that the environmental consequences of a proposed action are adequately evaluated is sufficient to support standing for purposes of challenging an agency's failure to prepare an environmental impact statement. This procedural injury alone is sufficient for standing, if the injury is alleged by a plaintiff "having a sufficient geographical nexus to the site of the challenged project that he may be expected to suffer whatever environmental consequences the project may have." *Friends of the Earth v. U.S. Navy,* 841 F.2d 927, 932 (9th Cir.1988); *City of Davis v. Coleman,* 521 F.2d 661, 671 (9th Cir.1975).

There is no question that Douglas County is within the affected geographic area and can be expected to incur environmental consequences of the designation of critical habitat for the Northern Spotted Owl.

As noted in *Oregon Environmental Council v. Kunzman,* 817 F.2d 484, 491 (9th Cir.1987), "(p)rocedural failures in EIS preparation create a risk that environmental impacts will be overlooked and provide sufficient 'injury in fact' to support stand-

ing." *See also Trustees for Alaska v. Hodel*, 806 F.2d 1378, 1380 (9th Cir.1986).

*Lujan v. National Wildlife Federation, supra,* appears to establish a more restrictive standard which requires a plaintiff to not only demonstrate an "adverse effect" or "aggrievement," but also that the interests were actually affected within the meaning of the relevant statute. However, the "actually affected" test is really nothing more than a restatement of the "geographical nexus" test discussed in *City of Davis v. Coleman, supra.* This conclusion is supported by the recent Supreme Court decision in *Manuel Lujan, Jr. v. Defenders of Wildlife,* —— U.S. ——, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), where the court noted that "... one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an Environmental Impact Statement, even though the dam will not be completed for many years." *Lujan v. Defenders of Wildlife, supra* at ——, 112 S.Ct. at 2142, n. 7.

Therefore, although procedural injury alone is not sufficient to establish standing, standing for procedural injury does exist where the procedures in question are designed to protect some threatened, concrete interest that is the ultimate basis for standing. *Id.,* n. 8.

Douglas County is within the area where the effects of the critical habitat designation will occur. The potential environmental and quality of life impacts resulting from the procedural injury in this case are the type of injuries NEPA seeks to prevent. Therefore, plaintiff's alleged procedural injuries are sufficient to establish plaintiff's standing to assert NEPA claims.

*Discussion:*

The National Environmental Policy Act of 1969 (NEPA) requires "to the fullest extent possible," that "all agencies of the Federal Government" shall:

(c) include in every recommendation or report on proposals for legislation and other Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental effects of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(C).

■ NEPA requirements do not mandate particular results or impose substantive obligations upon the agencies, but they do mandate a necessary process. *Robertson v. Methow Valley Citizen's Council,* 490 U.S. 332, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989).

■ If an agency is unsure whether a proposed action requires an EIS, federal regulations (40 CFR 1508.9) direct the agency to prepare an environmental assessment (EA) to determine whether an EIS must be prepared. *ONRC v. Lyng,* 882 F.2d 1417, 1421–22 (9th Cir.1989). The EA must be sufficiently documented to satisfy the reviewing court that the decision not to prepare an EIS was not arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

Plaintiff contends that the Secretary's designation of critical habitat in this case is a major federal action to which NEPA procedural requirements apply.

Defendant contends that NEPA does not apply to the designation of critical habitat under ESA. The "respective statutes' language and legislative histories indicate, Congress never intended that the purely procedural obligations of NEPA be superimposed on the procedure the Secretary already is obliged to follow in making critical habitat designations." Memorandum in

Support of Defendant's Motion for Summary Judgment (# 62), p. 34.

The proposed agency action in this case affects approximately 6.9 million acres. The magnitude of that action in terms of number of acres alone leads to the conclusion that the rule constitutes a major federal action. The record reflects that the designation will impact the economy, employment, public health, and social services in the affected geographic area. Therefore, the action clearly affects the "quality of the human environment."

The issue then becomes whether there is an express or implied exemption from NEPA requirements for the designation of critical habitat under ESA.

Prior to September, 1983, FWS routinely prepared environmental assessments for all regulations under which a species was listed or critical habitat was designated. On October 25, 1983, FWS issued a notice that it had determined that environmental assessments as defined by NEPA need not be prepared in connection with regulations adopted pursuant to Section 4(a) of ESA. 48 Fed.Reg. 49244 (Oct. 25, 1983). This procedural change was based on recommendations from the Council on Environmental Quality (CEQ) that Section 4 listing decisions are exempt from NEPA review as a matter of law. *Id.* The CEQ recommendation was based primarily on *Pacific Legal Foundation v. Andrus,* 657 F.2d 829 (6th Cir.1981). *See* Memorandum in Support of Motion (# 19), Exhibit C. The letter also suggested that a listing action "could be classified as a categorical exclusion." *Id.*[3]

However, defendant contends:

FWS has not relied on a categorical exclusion in determining not to prepare an EIS. As stated in the 1983 "Rule-related notice," the decision to cease preparation of NEPA documentation for Section 4(a) regulations (listing and critical habitat regulations) was based primarily on the Court's reasoning in *Pacific Legal Foundation* ... (where the court found) ... not that there was a categorical exclu-

sion, but that FWS was exempt from NEPA.
Defendant's Reply Memorandum (# 72), p. 11.

The crux of defendant's argument is that it is exempt from NEPA when designating critical habitat "for the same reasons the Court in *Pacific Legal Foundation* held it was exempt from NEPA when it conducted a listing determination." Reply Memorandum (# 72), p. 12. Therefore, the issue to be decided here is whether the court's reasoning in *Pacific Legal Foundation v. Andrus* regarding listing decisions can be extended and applied to decisions to designate critical habitat.

In *Pacific Legal Foundation v. Andrus,* the Sixth Circuit held that the Secretary is legally exempt from NEPA in performing the ESA obligation to list endangered and threatened species pursuant to Section 4(a) of ESA. The court's holding rests on four grounds. (1) To require the Secretary to comply with NEPA process when making a listing decision under ESA, "does not and cannot serve the purpose of the Endangered Species Act." *Pacific Legal Foundation v. Andrus, supra* at 835. (2) To require the Secretary to prepare an EIS when making listing decisions under ESA, "would not serve the purpose for filing such a statement." *Id.* at 836. (3) The Secretary's "action in listing species as endangered or threatened furthers the purpose of NEPA even though no impact statement is filed. *Id.* at 837. (4) The legislative histories of both ESA and NEPA support the view that the Secretary is exempt from compliance with NEPA process when making a decision to list a species under ESA. *Id.* at 838–40.

■■■ Every federal agency is expected to comply with NEPA unless there is a statutory conflict with the agency's authorizing legislation that expressly prohibits or makes full compliance impossible. *See* H.R.Conf.Rep. No. 91–765, 91st Cong., 1st Sess. (1969), reprinted in [1969] U.S.Code Cong. & Admin.News 2767, 2770; *Flint Ridge Development Co. v. Scenic Rivers Ass'n of Oklahoma,* 426 U.S. 776, 787–88,

---

**3.** For definition of "categorical exclusion," *see*     40 CFR 1508.4.

96 S.Ct. 2430, 2437–38, 49 L.Ed.2d 205 (1976).

In *Flint Ridge, supra,* the issue was whether the Department of Housing and Urban Development had to file an impact statement before allowing a disclosure letter filed by a private developer to become effective. HUD argued it did not, because (1) it had only limited discretion and no power to consider environmental concerns, and (2) it had to act within 30 days or the disclosure letter automatically became effective and this time-table made compliance with NEPA impossible. The Court found preparation of the impact statement inconsistent with HUD's statutory duties because of the time constraint and did not reach the first argument. *See* 426 U.S. at 787–91, 96 S.Ct. at 2437–40.

In *Pacific Legal Foundation v. Andrus,* the court addressed the issue left open by the Supreme Court in *Flint Ridge* and found that, because there was a conflict between NEPA and ESA's statutory procedures relating to the listing of a species as threatened or endangered, no NEPA compliance was required when listing decisions were made.

The statutory mandates and procedures applicable to listing threatened or endangered species are distinguishable from those governing the designation of critical habitat. Therefore, although the analysis in *Pacific Legal Foundation v. Andrus* is useful in deciding the issue, it is not controlling in this action.

1. In *Pacific Legal Foundation v. Andrus,* the court found that compliance with NEPA process when making listing decisions under ESA "does not and cannot serve the purpose of the Endangered Species Act." *See,* 657 F.2d at 835. The reason for the court's conclusion was that the Secretary is required to list a species as endangered or threatened based on five factors set forth in ESA. "The Secretary does not have the discretion to consider the five factors to be considered in filing an impact statement." *Id.* The court reasoned that the requirement of NEPA to address procedurally that which cannot be considered substantially under ESA indicates that NEPA was not meant to apply. *Id.* at 835–36.

FWS argues that "as in its original decision to list a species, FWS does not have the discretion to consider the wide range of impacts required to be analyzed in preparing NEPA documentation." Memorandum in Support of Defendant's Motion (# 62), p. 37. Therefore, FWS concludes that "the tension that the Sixth Circuit found to exist between NEPA and ESA in the context of listing decisions also exists in the context of critical habitat designation." *Id.,* pp. 37–37.

The critical habitat designation process is set forth in 16 U.S.C. § 1533(b)(2). First, FWS must identify areas that meet the scientific definition of critical habitat found in 16 U.S.C. § 1532(5)(A). Then, FWS is to consider the economic and other relevant impacts of designation for each area. After consideration of the economic and other relevant impacts, FWS must determine whether any identified areas should be excluded from the final critical habitat designation because the benefits of exclusion outweigh the benefits of designation. Regardless of considerations relevant to the exclusion determination, FWS must designate an area if the failure to do so would result in extinction of the species.

Thus, FWS has the discretion to consider the "economic impact and **any other relevant impact** of specifying any particular area as critical habitat." 16 U.S.C. § 1533(b)(2). "[A]ny other relevant impact" can logically be construed as including the wide range of impacts required to be analyzed in preparing NEPA documentation. I am not persuaded by defendant's attempt to distinguish between the exercise of discretion with respect to the "designation process" as opposed to the "exclusion process." The exclusion process is part of the designation process in that it results in the identification of the area determined to be appropriate for final designation. Therefore, to argue that discretion can be exercised only with respect to excluding identified critical habitat from final designation is a matter of semantics.

The fact that FWS discretion to exclude a specific area from final designation is ultimately limited if doing so would result in the extinction of the species, does not alter the fact that it generally has wide discretion in exempting certain areas, short of the extinction scenario. *See Forelaws on Board v. Johnson*, 743 F.2d 677, 680–681 (9th Cir.1984) [declining to follow reasoning of *Pacific Legal Foundation v. Andrus* in part because the action the statute required the agency to take included broad discretionary obligation to adopt measures to protect the environment.]

Defendant also argues that the designation process already obligates FWS to prepare a complete analysis of all of the impacts relevant to its decision on final habitat designation and that any impacts examined in a NEPA document would unnecessarily duplicate information FWS has already developed and analyzed pursuant to 16 U.S.C. § 1533(b)(2).[4]

Although the statutes require an analysis of impacts that is similar in some respects, defendant has argued that the NEPA process requires analysis of a wide range of impacts not contemplated under ESA. Further, defendant states: "FWS is not contending that it has *met* the requirements of NEPA, it is contending that it is *exempt* from the requirements of NEPA." Reply Memorandum (# 72), p. 9, n. 7. Therefore, defendant acknowledges that NEPA requires a wider range of analysis than required by ESA.

Based on the foregoing, I find that to impose the procedural steps required by NEPA in addition to those FWS must take under ESA would not "either duplicate information FWS already has to develop and analyze ... or represent information that FWS may not legally consider in the designation process." Memorandum in Support (# 62), pp. 38–39. Contrary to defendant's argument, there are no clear "bright lines" that limit the impacts the Secretary may consider in designating critical habitat. NEPA review is designed to require consideration of all of the implications of the proposed agency action. Such a review is not incompatible with the purpose or the requirements of ESA, and there are no conflicting statutory mandates. The fact that ESA has a similar, although less extensive, impacts review and analysis requirement supports the conclusion that the NEPA process serves the purpose of ESA.

2. The second determining factor in *Pacific Legal Foundation v. Andrus* was the court's conclusion that preparation of an EIS would not serve the purpose of NEPA because "the statutory mandate of ESA prevents the Secretary from considering the environmental impacts when listing a species as endangered or threatened." *See* 657 F.2d at 836.

As noted above, NEPA is primarily a procedural statute to insure that an agency considers the environmental impacts of its actions. The EIS is evidence that environmental concerns were considered by the agency. In *Pacific Legal Foundation v. Andrus*, the court held that the impact statement "cannot insure the agency made an informed decision and considered environmental factors where the agency has no authority to consider environmental factors." *Id.*

Defendant contends that similar restrictions on the Secretary's discretion in designating critical habitat render the examination of environmental effects irrelevant to the ultimate decision. "Because the designation of critical habitat is circumscribed by considerations of only the 'best scientific data,' 16 U.S.C. § 1533(b)(2), FWS is prevented from considering any environmental impacts other than those economic and other impacts relevant to the exclusion process." Reply Memorandum (# 72), p. 9.

As discussed above, defendant's argument in this regard is based on an unrea-

---

**4.** This argument has the ring of a "functional equivalent" argument. However, despite the suggestion in *Pacific Legal Foundation v. Andrus* that ESA may now provide the functional equivalent of an impact statement when critical habitat is designated, *See* 657 F.2d at p. 835, defendant contends that it is not making a functional equivalent argument. In relying exclusively on an exemption argument, defendant seems to be putting all of their eggs in one arguably vulnerable basket.

sonably restrictive interpretation of ESA. Although the initial identification of critical habitat is to be based on "the best scientific data available," 16 U.S.C. § 1533(b)(2), the identification of habitat is the beginning and not the end of the statutory process. After critical habitat has been identified, it is subject to review and analysis in terms of economic and other relevant impacts to determine which areas identified as within the strict statutory parameters of critical habitat should be excluded from final designation. I find that the Secretary's discretion to consider environmental impact is not as "circumscribed" as defendant contends and that developing NEPA documentation for critical habitat designation does serve the purpose of NEPA.

Defendant also contends that because a critical habitat designation represents a mandatory obligation that FWS must perform once it decides to list a species, it is not the type of agency action that is possible to be influenced by considerations identified in NEPA documentation. In other words, "designation is not a 'proposal' to act that FWS may decide whether or not to adopt. *See* 40 CFR § 1502.14(d) (requiring inclusion of a 'no action' alternative in EIS's discussion of alternatives)." Memorandum in Support (# 62), p. 41. However the exclusion provisions of the statutory scheme in a sense make the decision to designate specific areas similar to "proposals" to act in a certain way and a decision to exclude a certain specific area can be compared to the adoption of a "no action" alternative.

I find that because the statutory requirements and limitations are factually distinguishable, the *Pacific Legal Foundation v. Andrus* conclusion that filing an EIS in the context of listing would not serve the purpose of NEPA is not applicable to critical habitat designation.

3. The third basis for the Court's decision in *Pacific Legal Foundation v. Andrus* was that "the Secretary's action in listing species as endangered or threatened furthers the purpose of NEPA even though no impact statement is filed." *See* 657 F.2d at p. 837. Defendant contends that

the designation of critical habitat, like listing decisions, serves the environmental goals of NEPA, even if it is not accompanied by preparation of NEPA documentation.

Reduced to its essence, defendant's argument in this regard is that NEPA does not apply to agencies whose function it is to protect the environment. Although the court in *Pacific Legal Foundation v. Andrus* concluded that Congress did not intend to have NEPA apply to "environment-enhancing agencies," *see* 657 F.2d at p. 838, n. 11, the Ninth Circuit has taken a different view.

First, as noted in *Pacific Legal Foundation v. Andrus,* some courts have recognized that one of the purposes of NEPA is to inform Congress, the Executive and the public about the environmental consequences of various agency actions. The Ninth Circuit is one such court. *See Trout Unlimited v. Morton,* 509 F.2d 1276, 1282 (9th Cir.1974). Although designation of critical habitat could serve NEPA's environmental enhancement goals without the preparation of an EIS, the secondary informative function of NEPA is not met unless analysis and documentation takes place.

Secondly, while some cases have indicated that agencies whose mission it is to protect the environment are exempt from NEPA requirements, the Ninth Circuit has applied this rule very narrowly. The leading case on this issue is *Flint Ridge Development v. Scenic Rivers Ass'n of Oklahoma, supra,* in which the court held that NEPA requires all agencies to comply with its requirements unless there is a clear and unavoidable statutory conflict. As discussed above, there is no such conflict in the present case.

Requiring the Secretary to file an impact statement or conduct an environmental assessment under the circumstances of this case would not necessarily "hinder ... efforts at attaining the goal of improving the environment." *Pacific Legal Foundation v. Andrus, supra* at 837. Even if the purpose of the agency or the agency action (designating critical habitat in this case) is to enhance the environment or maintain the

status quo, the environmental consequences of a particular agency action cannot be determined absent an environmental assessment.

Judge Frye addressed this issue in *Portland Audubon Society v. Lujan*, (D.Or. 1992), 795 F.Supp. 1489, in which the BLM argued it was exempt from NEPA, because (1) the requested relief under the NEPA claim conflicted with the O & C Act, 43 U.S.C. § 1181 et seq.; and, (2) it should be excused from complying with NEPA because the failure to comply would, in effect, have a positive environmental impact.[5]

In resolving the issue, Judge Frye did not find either argument persuasive. As to the positive environmental impact theory that the agency's non-action would in effect preserve habitat, she noted that such a "conclusion ... would allow the BLM to continue to act insulated from public comment because of its own delay in examining the environmental consequences of its actions." *Portland Audubon Society v. Lujan, supra* at 1507. Similarly, in this case, the contention that designation of critical habitat enhances environmental quality presumes a conclusion that is not clear absent an environmental assessment.

Under the law of the Ninth Circuit, environmental enhancing agencies and actions are not exempt from NEPA absent a clear and unavoidable statutory conflict. The relevant inquiry in each case is whether the proposed action has a significant impact on the quality of the human environment. This question cannot be answered without at least going through the preliminary environmental assessment stage. *See Jones v. Gordon*, 792 F.2d 821 (9th Cir.1986). It is only through the analysis mandated by NEPA that the true impacts of an agency action can be identified and evaluated.

4. In *Pacific Legal Foundation v. Andrus*, the court found: "Though not without ambiguity, the legislative history suggests that NEPA was not intended to be applied to agencies whose function was to protect the environment." *See* 657 F.2d at

838. While observing that the legislative history of the Endangered Species Act of 1973 is "very sparse," the court concluded: "Viewing all of the legislative history of both acts, this court concludes that Congress intended listing of a species as endangered or threatened to be a mandatory act dependent upon the five factors found in ESA and not upon environmental impact concerns found in NEPA and that Congress did not intend to require the Secretary to file an environmental impact statement before listing a species as endangered or threatened under ESA." *Id.* at 839–40.

Defendant contends that the legislative histories of NEPA and ESA indicate that Congress did not intend for NEPA to apply to designation of critical habitat under ESA.

The Court in *Pacific Legal Foundation v. Andrus* acknowledged that NEPA's legislative history was not without ambiguity. Although the Sixth Circuit concluded that NEPA was not intended to be applied to agencies whose function is to protect the environment, as discussed above in Section 3, the Ninth Circuit has taken the position that NEPA applies to every major federal action absent a clear and unavoidable statutory conflict.

NEPA had been in effect approximately nine years when Congress amended ESA in 1978. As part of the 1978 amendments, Congress provided that the Secretary was required to consider the economic effects and other relevant impacts of the designation of critical habitat and publish an evaluation of any activities that may be impacted by the designation. Defendant argues that these clearly are steps that NEPA and the implementing regulations already required of federal agencies when contemplating a proposed major federal action significantly affecting the quality of the human environment. "In making these amendments to ESA therefore, Congress must have been operating under the assumption that NEPA did not apply to critical habitat designation because otherwise such amend-

---

5. Although the BLM is not necessarily an agency "whose function it is to protect the environment," it's non-compliance with NEPA was allegedly an environment enhancing action in that case.

ments would have been largely superfluous. *See Merrell v. Thomas,* 807 F.2d 776, 780 (9th Cir.1986)." Memorandum in Support (# 62), p. 43.

Were there no other legislative history, the implication suggested by defendant's argument might be convincing. However, I find from other aspects of the legislative history of the 1978 amendments that the most reasonable interpretation of legislative intent is that the application of NEPA to designation of critical habitat depends on whether the specific designation is a major federal action. This conclusion is consistent with the Sixth Circuit's opinion in *Pacific Legal Foundation v. Andrus. See* 657 F.2d p. 840, n. 13.

During debates relative to the 1978 amendments to ESA, Senator McClure introduced an amendment defining the designation of critical habitat as a major federal action significantly affecting the quality of the human environment, requiring the filing of an EIS. *See* Cong.Rec. 21587, July 19, 1978. This amendment was originally offered in committee and rejected. When it was offered again in the Senate floor, Senator Wallop spoke in opposition. His opposition was not based on the belief that ESA should be exempt from NEPA, but rather on the basis that it would make filing an EIS an absolute requirement when in fact many designations would not be major federal actions. Cong.Rec. 21589, July 19, 1978. Senator Wallop's comments indicate he believed ESA's "silence ... surely does not prohibit suits to compel that environmental impact statements be filed under the provisions of NEPA if the action is determined to be a major Federal action. *Id.* Senator McClure agreed with Senator Wallop and indicated his desire to "underscore" the possibility that an EIS may be required in connection with the designation of critical habitat. *Id.* Senator McClure emphasized that he did not want the record to suggest that absent a specific statutory requirement of an EIS, that an EIS would never be required. *Id.* Although the remarks of individual legislators should not be given controlling effect,

*Northern Colorado Water Conservancy Dist. v. FERC,* 730 F.2d 1509, 1518 (D.C.Cir.1984), *see also In re Kelly,* 841 F.2d 908, 912 (9th Cir.1988), I believe that this discourse indicates that ESA's silence regarding NEPA's requirements represents a considered choice to leave NEPA requirement determinations dependent upon the facts of each particular situation.

Support for this position is found in the Conference Report in which it is noted:

... Where critical habitat is specified ... actual notice of the regulation and any environmental assessment or environmental impact statement prepared on it is required to be given to all general local governments within or adjacent to the proposed critical habitat at least 60 days prior to the effective date.
1978 U.S.Code Cong. and Administrative News 9484, 9494.

Based on the above analysis, I find that the reasoning in *Pacific Legal Foundation v. Andrus* does not lead to the conclusion that FWS is exempt from NEPA requirements when designating critical habitat. The court's conclusion in that case was specifically limited to listing decisions which are statutorily distinguishable from the critical habitat designation process. The rationales for the court's conclusion in *Pacific Legal Foundation v. Andrus,* are simply not present when the reasoning is examined in terms of critical habitat designation.

*Amicus Curiae Headwaters, et al., opposition:*

Headwaters opposes Douglas County's motion on the grounds that: (1) an EIS is not required for actions that do not change the physical environment, and (2) an EIS would not promote the environmental purposes of ESA or NEPA. Headwaters' second ground essentially relies on *Pacific Legal Foundation v. Andrus,* which as discussed above does not control in this action.

Headwaters' contention that NEPA does not apply to actions that don't change the physical environment is more problematic.[6]

---

**6.** A similar argument was characterized as fol-

lows: "In essence plaintiff's claim is that the

However, regardless of the merits of Headwaters' argument in this regard, it cannot be determinative of the issue before the court because it assumes a fact not in evidence. That is, Headwaters' argument assumes that the designation decision will not effect changes in the physical environment. As noted above, that presumption is not necessarily accurate. For example, plaintiff has presented evidence that allowing more area to acquire old-growth characteristics may impact species with different habitat requirements. In short, it is not a "given" that defendant's designation of critical habitat will enhance or merely preserve the existing environmental status quo.

█ CEQ regulations require NEPA documentation where a major federal action has both beneficial and adverse effects, "even if the Federal agency believes that on balance the effect will be beneficial." 40 CFR § 1508.27(b)(1); *see Environmental Defense Fund v. Marsh,* 651 F.2d 983, 993 (5th Cir.1981). In this case, the designation of critical habitat allegedly has beneficial effects for the Northern Spotted Owl, but adverse effects on other species and adverse socio-economic effects on the human environment. NEPA documentation must be prepared in such a mixed effects situation. *American Horse Protection Ass'n v. Andrus,* 608 F.2d 811, 814–815 (9th Cir.1979). As discussed above, the full range of environmental effects of a particular agency action cannot be determined without at least engaging in the preliminary NEPA process of conducting an environmental assessment.

I find that all federal agencies are required to comply with NEPA when considering major federal actions that significantly affect the quality of the human environment, unless there is a clear and unavoidable statutory conflict. There is no such statutory conflict here. The threshold question of whether there is an effect on the human environment is a question that is to be answered through the environmental assessment and impact analysis of NEPA, a process which was not followed in the designation of critical habitat in this case.

█ Defendant argues that the court should decline to grant the injunction plaintiffs seek even if it should find FWS to be in violation of required statutory procedures because such an "injunction is not warranted on a balancing of equitable factors at issue in the case and would call for FWS to violate a federal District Court order and competing statutory mandate." Memorandum in Support (# 62), p. 46.[7]

Although the Secretary is under a court-imposed mandate to designate critical habitat, this mandate stops short of authorizing the Secretary to ignore the relevant provisions of NEPA or ESA. The court ordered FWS to "... publish its proposed critical habitat plan no later than forty-five (45) days thereafter. The final rules shall be published at the earliest possible time permitted under the appropriate regulations." *Northern Spotted Owl et al. v. Manuel Lujan, supra* at 629–630. Therefore, although the court ordered that the final rule relative to critical habitat be published, it did not imply an exemption from NEPA or ESA requirements. Granting the relief plaintiff seeks in this case would not result in the violation of a federal district court order.

In balancing the equities, I find that the severe hardship to Douglas County and other areas affected by the Secretary's designation and the public interest in requiring compliance with environmental laws tips the scales decidedly in plaintiff's favor. The social and economic impacts as well as the biological uncertainty to other species

Department of Agriculture must prepare an EIS in order to leave nature alone." *National Association of Property Owners v. U.S.,* 499 F.Supp. 1223, 1265–66 (D.Minn.1980), aff'd, 660 F.2d 1240 (8th Cir.1981). The court was not persuaded by this argument.

7. The final rule designating critical habitat has already been adopted. Therefore, plaintiff's request for injunctive relief is moot. Accordingly, plaintiff's claim is construed as seeking declaratory relief and *setting aside* the designation of critical habitat. The same balancing of equities applies to either way the requested relief is viewed.

justifies an injunction until the defendant complies with the provisions of NEPA.

Plaintiff and Intervenor plaintiffs' motions for summary judgment (# 15, # 36, # 41) are allowed. Defendant's motion for summary judgment (# 60) is denied. Plaintiff and Intervenor plaintiffs are allowed 20 days to apply to the court for appropriate relief, with a proposed form of order. That filing should be calendared by the clerk so defendant can submit a response to the proposed order.