48 F.3d 1495
 40 ERC 1225, 63 USLW 2536, 25 Envtl.
L. Rep. 20,631
 DOUGLAS COUNTY, a political subdivision of the State of
Oregon, Plaintiff-Appellee.
v.
Bruce BABBITT, Secretary of the Interior, United States
Department of the Interior, Defendant-Appellant.
DOUGLAS COUNTY, a political subdivision of the State of
Oregon, Plaintiff-Appellee,
v.
Bruce BABBITT, Defendant,
and
HEADWATERS, INC.; Umpqua Valley Audubon Society,
Defendants-Intervenors-Appellants.
 Nos. 93-36013, 93-36016.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Jan. 9, 1995.
Decided Feb. 24, 1995.
 
 Albert M. Ferlo, Jr., Environmental and Natural Resources Div., U.S. Dept. of Justice, Washington, DC, for defendant-appellant.
 Ronald S. Yockim, Cegavske, Johnston, Yockim & Associates, Roseburg, OR, for plaintiff-appellee.
 Todd D. True, Sierra Club Legal Defense Fund, Inc., Seattle, WA, for defendants-intervenors-appellants.
 Scott W. Horngren, Haglund & Kirtley, Portland, OR, and Steven P. Quarles, Crowell & Moring, Washington, DC, for Timer Amici.
 Appeals from the United States District Court for the District of Oregon.
 Before: PREGERSON and TROTT, Circuit Judges, and FITZGERALD, Senior District Judge.*
 PREGERSON, Circuit Judge:
 
 I. OVERVIEW
 
 1
 Secretary of the Interior Bruce Babbitt (the Secretary) and intervenors, Headwaters, Inc. and Umpqua Valley Audubon Society (Headwaters), appeal the district court's grant of summary judgment in favor of Douglas County, Oregon (the County), in the County's action alleging that the Secretary failed to comply with the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. Sec. 4321 et seq., in designating certain federal land as critical habitat for the Northern Spotted Owl pursuant to the Endangered Species Act of 1973 (ESA), 16 U.S.C. Sec. 1533(a)(3). The district court granted the County permanent injunctive relief, setting aside the critical habitat designation, but then stayed its order pending appeal. We have jurisdiction under 28 U.S.C. Sec. 1291. We affirm in part, reverse in part, and remand for consideration.
 
 II. BACKGROUND
 
 2
 A. The Statutory Framework.
 
 
 3
 1. The Endangered Species Act.
 
 
 4
 Under Sec. 4(a) of the ESA, 16 U.S.C. Sec. 1533(a), the Secretary[1] may list a species as threatened or endangered. When the Secretary lists a species, he or she must also designate a "critical habitat" for that species. 16 U.S.C. Sec. 1533(a)(3). The ESA defines "critical habitat" as the geographical areas "essential to the conservation of the species." 16 U.S.C. Sec. 1532(5)(A). The Secretary must decide what area to designate as a critical habitat "on the basis of the best scientific data available and after taking into consideration the economic impact, and any other relevant impact, of specifying any particular area as critical habitat." 16 U.S.C. Sec. 1533(b)(2). The ESA requires the Secretary to follow a clear set of procedures for public notification and comment after he or she designates a critical habitat. 16 U.S.C. Sec. 1533(b)(4)-(6). The effect of designating an area as a critical habitat is that federal actions that are likely to destroy or disrupt the habitat are prohibited. 16 U.S.C. Sec. 1536(a)(2).
 
 
 5
 2. The National Environmental Policy Act.
 
 
 6
 Section 102(2)(C) of NEPA, 42 U.S.C. Sec. 4332(2)(C), requires "to the fullest extent possible," that "all agencies of the Federal Government" shall
 
 
 7
 (C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on--
 
 
 8
 (i) the environmental impact of the proposed action,
 
 
 9
 (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
 
 
 10
 (iii) alternatives to the proposed action,(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
 
 
 11
 (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.
 
 
 12
 The above describes the requirements for an environmental impact statement (EIS). The EIS is "a procedural obligation designed to assure that agencies give proper consideration to the environmental consequences of their actions." Merrell v. Thomas, 807 F.2d 776, 777-78 (9th Cir.1986), cert. denied, 484 U.S. 848, 108 S.Ct. 145, 98 L.Ed.2d 101 (1987). The EIS also insures that the public is informed about the environmental impact of proposed agency actions. See Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349, 109 S.Ct. 1835, 1845, 104 L.Ed.2d 351 (1989). An environmental assessment (EA) is a document used to decide whether the environmental impact of a proposed action is significant enough to warrant preparation of an EIS. See 42 U.S.C. Sec. 4332(2)(E); 40 C.F.R. Sec. 1508.9 (1994).
 
 
 13
 B. Facts.
 
 
 14
 On June 26, 1990, in response to litigation brought by a number of environmental groups, Northern Spotted Owl v. Hodel, 716 F.Supp. 479 (W.D.Wash.1988), the Secretary listed the Northern Spotted Owl as a threatened species pursuant to the ESA. 55 Fed.Reg. 26,114 (1990). In his final rule, the Secretary explained that he could not designate a critical habitat based only on the available information. Plaintiffs in the litigation sought an order compelling the Secretary to begin the designation process, and the district court ordered the Secretary to publish a proposed critical habitat designation by April 30, 1991. The court also ordered the Secretary to publish a final designation rule "at the earliest possible time permitted under the appropriate regulations." Northern Spotted Owl v. Lujan, 758 F.Supp. 621, 630 (W.D.Wash.1991).
 
 
 15
 On May 6, 1991, the Secretary published an initial proposed regulation designating 11,639,195 acres of federal, state and private lands as "proposed critical habitat." 56 Fed.Reg. 20,816 (1991). The Secretary also announced his intention to revise the designation after receiving comments on the initial proposal. Id. After proposing the critical habitat, the Secretary held four public hearings at which 364 people testified on the proposal.
 
 
 16
 As part of his May 6, 1991 announcement, the Secretary concluded that he did not need to prepare an EA (and therefore an EIS) in conjunction with the designation. 56 Fed.Reg. 20,824 (1991). The Secretary referred to a policy, that he first announced in 1983, that determinations made under Sec. 4 of the ESA were not subject to NEPA. The 1983 policy was based primarily on (1) the Sixth Circuit's holding in Pacific Legal Foundation v. Andrus, 657 F.2d 829 (6th Cir.1981), that decisions to list species as threatened or endangered under the ESA were exempt from NEPA, and (2) a letter from the Council on Environmental Quality (CEQ) whose "interpretation of NEPA is entitled to substantial deference," Andrus v. Sierra Club, 442 U.S. 347, 358, 99 S.Ct. 2335, 2341, 60 L.Ed.2d 943 (1979), that urged the Secretary to cease preparing EISs in conjunction with actions under Sec. 4 of the ESA. 48 Fed.Reg. 49,244 (1983). On May 30, 1991 Douglas County submitted formal comments to the Secretary, alleging that the Secretary had failed to comply with NEPA.
 
 
 17
 The Secretary issued a revised proposed designation of critical habitat on August 13, 1991. 56 Fed.Reg. 40,002 (1991). The revised designation reduced the critical habitat to 8,240,160 acres by eliminating all privately owned land and most state owned land. The Secretary held another sixty day comment period on the proposed designation and announced another four public hearings. The revised proposal affirmed the Secretary's decision that an EA was not necessary.
 
 
 18
 On January 15, 1992, the Secretary issued the final designation of critical habitat. 57 Fed.Reg. 1,796 (1992). The final designation includes 6,887,000 acres, all of which is federal land. The final rule includes a lengthy analysis of all the factors that led to the final critical habitat designation.
 
 
 19
 Douglas County filed this suit in United States District Court for the District of Oregon on September 25, 1991, seeking declaratory and injunctive relief. The County's primary allegation is that the Secretary failed to comply with NEPA in designating a critical habitat. The Secretary challenged Douglas County's standing to bring the action. All parties filed motions for summary judgment after publication of the final designation.
 
 
 20
 The district court found that the County had standing to pursue its claims. The court granted summary judgment on behalf of the County, finding that NEPA did apply to the Secretary's decision to designate a critical habitat. See Douglas County v. Lujan, 810 F.Supp. 1470, 1484-85 (D. Oregon 1992).[2] The district court entered an order setting aside the final designation of critical habitat until the Secretary complies with NEPA. The court then, sua sponte, stayed the order pending appeal.
 
 III. ANALYSIS
 
 21
 On appeal, the Secretary and Headwaters argue that the district court erred when it ruled in favor of the County. The Secretary asserts that the County does not have standing and, on the merits, argues that NEPA does not apply to designations of critical habitat because the ESA procedures have displaced the NEPA procedures. Headwaters argues that an EIS is not required because the federal action at issue does not change the natural, physical environment, and because requiring an EIS would frustrate the purposes of both NEPA and the ESA. Appellee Douglas County and amici Northwest Forest Resource Council, Douglas Timber Operators, Southern Forest Products Association, Southern Timber Purchasers Council, and American Forest & Paper Association (Timber), respond to these claims.
 
 
 22
 A. Standing.
 
 
 23
 1. Standard of Review.
 
 
 24
 We review questions of standing de novo. See Wedges/Ledges of Cal., Inc. v. City of Phoenix, Ariz., 24 F.3d 56, 61 (9th Cir.1994).
 
 
 25
 2. Analysis.
 
 
 26
 The Supreme Court articulated the requirements for Article III standing in Lujan v. Defenders of Wildlife, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992):
 
 
 27
 First, the plaintiff must have suffered an "injury in fact"--an invasion of a legally-protected interest which is (a) concrete and particularized and (b) "actual or imminent, not 'conjectural' or 'hypothetical,' " Second, there must be a causal connection between the injury and the conduct complained of--the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... the result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."
 
 
 28
 Id. 504 U.S. at ----, 112 S.Ct. at 2136 (citations omitted).
 
 
 29
 In addition to these constitutional requirements, a plaintiff challenging a statutory provision under the Administrative Procedure Act (APA), 5 U.S.C. Secs. 551 et seq., must show that the injury he or she has suffered falls within the "zone of interests" that the statute was designed to protect. See Lujan v. National Wildlife Federation, 497 U.S. 871, 883, 110 S.Ct. 3177, 3186, 111 L.Ed.2d 695 (1990); Douglas County, 810 F.Supp. at 1475. Describing the "zone of interests" under NEPA, we recently stated that:
 
 
 30
 NEPA was enacted in order "to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C. Sec. 4321 (1988). The purpose of NEPA is to protect the environment, not ... economic interests.... Therefore, a plaintiff who asserts purely economic injuries does not have standing to challenge an agency action under NEPA.
 
 
 31
 Nevada Land Action Ass'n v. U.S. Forest Service, 8 F.3d 713, 716 (9th Cir.1993) (citations omitted).
 
 
 32
 To find that the County's interests do not fall inside the "zone of interests" protected by NEPA, we would have to find that (1) the County's interests are inconsistent with the purposes of NEPA, and that (2) the interests are so inconsistent that it would be unreasonable to assume that Congress intended to permit the suit. See Mt. Graham Red Squirrel v. Espy, 986 F.2d 1568, 1582-83 (9th Cir.1993) (citing Clarke v. Security Industry Ass'n, 479 U.S. 388, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987)).
 
 
 33
 Douglas County asserts that it has standing based on several types of injuries: procedural injury, injury to its proprietary interests, injury to the quality of life of its citizens, injury to wildlife within the county, and injury to its resource management interests. We conclude that the narrow circumstances of this case are sufficient to support procedural standing for Douglas County. This being the case, there is no need for us to address the other alleged bases for standing.
 
 
 34
 The County asserts that it has standing "based upon its procedural injuries resulting from the FWS's failure to prepare an environmental document that explores a range of alternatives and cumulative effects." Appellee Opening Brief at 15. The Supreme Court recently addressed the issue of procedural standing in Lujan v. Defenders of Wildlife, 504 U.S. 555, ---- n. 7, 8, 112 S.Ct. 2130, 2142 n. 7, 8, 119 L.Ed.2d 351 (1992).[3] The Court suggested that plaintiffs living near a site for a proposed federal dam would have procedural standing to sue if the licensing agency failed to prepare an EIS, even though the EIS may have no impact on the plans for the dam. See id. 504 U.S. at ---- n. 7, 112 S.Ct. at 2142 n. 7. Lujan requires a plaintiff to show two essential elements for procedural standing: (1) that he or she is a "person who has been accorded a procedural right to protect [his or her] concrete interests...." Lujan, 504 U.S. at ---- n. 7, 112 S.Ct. at 2142 n. 7[4] and (2) that the plaintiff has "some threatened concrete interest ... that is the ultimate basis of [his or her] standing." Lujan, 504 U.S. at ---- n. 8, 112 S.Ct. at 2143 n. 8; see also Douglas County, 810 F.Supp. at 1477.[5] In addition, plaintiffs must show that their interest falls within the "zone of interests" that the challenged statute is designed to protect. See Pacific Northwest, 25 F.3d at 1450; Friends of the Earth, 841 F.2d at 932.
 
 
 35
 The County has been "accorded a procedural right" because NEPA provides that "local agencies, which are authorized to develop and enforce environmental standards" may comment on the proposed federal action. 42 U.S.C. Sec. 4332(2)(C). The County is such a local agency because an Oregon Statute authorizes counties to "[p]repare, adopt, amend, and revise" land management plans that contain environmental standards. Or.Rev.Stat. Sec. 197.175 (1993); see also Or.Admin.R. 660-06-000.
 
 
 36
 The County must also show a "concrete interest" that underlies its procedural interest. That interest must be within the zone of interests NEPA was designed to protect. The County's proprietary interest in its lands adjacent to the critical habitat represents this necessary "concrete interest". The affidavit of Kenneth Hendrick, director of the Land Department for Douglas County, expresses concerns with the proposed critical habitat designation. Hendrick alleges that the land management practices on federal land could affect adjacent county-owned land: "By failing to properly manage for insect and disease control and fire, the federal land management practices threaten the productivity and environment of the adjoining [county] lands." E.R. at 33-34.
 
 
 37
 These statements describe concrete, plausible interests, within NEPA's zone of concern for the environment, which underlie the County's asserted procedural interests. It is logical for the County to assert that its lands could be threatened by how the adjoining federal lands are managed.[6] It is uncertain whether the findings of an EIS would affect the Secretary's critical habitat designation and when the adjacent county lands would actually be harmed. But under Lujan, those concerns are not important: "The person who has been accorded a procedural right to protect his concrete interests can assert the right without meeting all the normal standards for redressibility and immediacy." Lujan, 504 U.S. at ---- n. 7, 112 S.Ct. at 2142 n. 7.
 
 
 38
 In short, the County meets all of Lujan's strict procedural standing requirements. The County has a procedural right, as well as a concrete interest that could be harmed by the critical habitat designation, and that interest is within the zone of interests protected by NEPA.
 
 
 39
 B. NEPA claims.
 
 
 40
 1. Standard of Review.
 
 
 41
 We review a district court's grant of summary judgment de novo. See Jesinger v. Nevada Fed. Credit Union, 24 F.3d 1127, 1130 (9th Cir.1994).
 
 
 42
 2. Analysis.
 
 
 43
 Whether NEPA applies to a decision of the Secretary to designate a critical habitat under the ESA is a question of first impression. Section 102(2)(C) of NEPA, 42 U.S.C. Sec. 4332(2)(C), requires "to the fullest extent possible," that "all agencies of the Federal Government" comply with the EIS requirements when they take "major Federal actions significantly affecting the quality of the human environment." Preparation of an EIS ensures both that agencies give proper consideration to the environmental consequences of their actions, see Merrell, 807 F.2d at 777-78, and that "relevant information will be made available to the larger audience that they may also play a role in ... the decisionmaking process...." Robertson, 490 U.S. at 349, 109 S.Ct. at 1845.
 
 
 44
 The Supreme Court has interpreted the language "to the fullest extent possible" to be "neither accidental nor hyperbolic." Flint Ridge Dev. Co. v. Scenic Rivers Ass'n, 426 U.S. 776, 787, 96 S.Ct. 2430, 2438, 49 L.Ed.2d 205 (1976). Rather, the Court found the language to be a "deliberate command" that the consideration of environmental factors not be "shunted aside" in the "bureaucratic shuffle." Id.
 
 
 45
 Despite the strict language of NEPA, courts have found that some agency actions are not subject to the NEPA requirements. We have noted that "NEPA was not intended to repeal by implication any other statute." Merrell, 807 F.2d at 779 (quoting United States v. Students Challenging Regulatory Agency Procedures (SCRAP), 412 U.S. 669, 694, 93 S.Ct. 2405, 2419, 37 L.Ed.2d 254 (1973)). One exception to NEPA's application derives from a statement made by the NEPA conferees. NEPA applies unless "the existing law applicable to such agency's operations expressly prohibits or makes full compliance with one of the directives impossible." H.Conf.Rep. No. 765, 91st Cong., 1st Sess. (1969), reprinted in 1969 U.S.C.C.A.N. 2767, 2770.
 
 
 46
 In Flint Ridge, 426 U.S. at 788, 96 S.Ct. at 2438, the Supreme Court, relying on the conferees' language, concluded that requiring the Secretary of the Department of Housing and Urban Development to prepare an EIS would create an "irreconcilable and fundamental conflict" with his or her duties under the Interstate Land Sales Full Disclosure Act. 15 U.S.C. Secs. 1701 et seq. The Court found that the Secretary could not prepare an EIS and still comply with the statutory duty to allow disclosure statements filed by developers to go into effect within 30 days of filing. See id. at 791, 96 S.Ct. at 2439-40.[7]
 
 
 47
 In contrast, the designation of a critical habitat at issue in the instant case does not occur in a highly restrictive time frame. Thus, time constraints alone would not prevent the Secretary from preparing an EIS. Douglas County argues that without this "irreconcilable" statutory conflict, NEPA must apply. We disagree, and, for the reasons set forth below, we hold that NEPA does not apply to the designation of a critical habitat.
 
 
 48
 a. ESA Procedures Have Displaced NEPA Requirements.[8]
 
 
 49
 In Merrell v. Thomas, 807 F.2d at 778, we found that NEPA did not apply when the EPA registered pesticides under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U.S.C. Secs. 136-136y. We traced the legislative history of FIFRA and concluded that because Congress created two different mechanisms in FIFRA and NEPA, and because Congress declined the opportunity to apply NEPA to FIFRA, that it intended that FIFRA procedures replace NEPA for pesticide registration. See id. at 778-79. Congress amended FIFRA after the passage of NEPA. Without mentioning NEPA, Congress created a procedure that made the NEPA procedure "superfluous." Id. at 778. However, the process under FIFRA was different from the NEPA procedures in several important respects, and the legislation represented a compromise among the various interested parties. See id. Congress amended FIFRA again in 1975, 1978, and 1984. Though it had the opportunity on those three occasions to alter legislatively the EPA's earlier interpretation of FIFRA that did not require compliance with NEPA, Congress declined to do so. We thus concluded that Congress did not intend for NEPA to apply to FIFRA.
 
 
 50
 The legislative history of the ESA at issue in the instant case follows a similar pattern and convinces us that Congress intended that the ESA procedures for designating a critical habitat replace the NEPA requirements. In 1978, eight years after the effective date of NEPA, Congress enacted a set of amendments to the ESA. The amendments provided a procedure for the designation of a critical habitat and allowed Congress to consider the economic impact of a designation. The language of the House Committee Report indicates that the members contemplated the structure of the entire process for designating critical habitats.[9] The report indicates that the committee members wished to introduce some "flexibility" into the stringent requirements of the ESA. H.R.Rep. No. 1625, 95th Cong., 2d Sess. 14, reprinted in 1978 U.S.C.C.A.N. 9453, 9464. The report states that "the legislation aims to improve the listing process and the public notice process" ensuring that the Secretary only makes a critical habitat designation "after a thorough survey of all the available data" and after notice to the affected communities. Id. The report later describes the extensive notice provisions that "will insure that the Department of the Interior is not listing species and designating critical habitat without consulting the views of the people of the affected area." Id. at 16.
 
 
 51
 The procedure Congress chose, as in Merrell, makes the NEPA procedure seem "superfluous." Before the Secretary can issue a final critical habitat designation, he or she must now (1) publish a notice and the text of the designation in the Federal Register; (2) give actual notice and a copy of the designation to each state affected by it; (3) give notice to appropriate scientific organizations; (4) publish a summary of the designation in local newspapers of potentially affected areas; and (5) hold a public hearing if one is requested. 16 U.S.C. Sec. 1533(b)(5). This carefully crafted congressional mandate for public participation in the designation process, like the FIFRA procedures reviewed in Merrell, displaces NEPA's procedural and informational requirements.
 
 
 52
 The process requires that the Secretary examine the effects of his or her actions by taking into account economic and other relevant impacts. Through that analysis and by examining "the best scientific data available," 16 U.S.C. Sec. 1533(b)(2), the Secretary will consider impacts that concern NEPA, to the extent that the critical habitat designation has a positive environmental effect on the species in question. The critical designation process also provides for public notice, another goal of NEPA. See Robertson, 490 U.S. at 349, 109 S.Ct. at 1845.
 
 
 53
 As in Merrell, however, the procedure in the statute at issue represents a "compromise between disparate points of view," H.R.Rep. No. 1625 at 13-14, 1978 U.S.C.C.A.N. 9463, 9464, which leaves little room for the imposition of the NEPA requirements. In Merrell, we concluded that applying NEPA to FIFRA's registration process would "sabotage the delicate machinery that Congress designed to register new pesticides." Merrell, 807 F.2d at 779. The same is true here. Congress through debate and compromise forged a specific process for the Secretary to follow when addressing the needs of endangered species. Requiring the EPA to file an EIS "would only hinder its efforts at attaining the goal of improving the environment." Pacific Legal Foundation, 657 F.2d at 837.
 
 
 54
 In addition, the ESA has an important mandate that distinguishes it from NEPA. Congress gave a special guideline to the Secretary in the critical habitat process. Though the Secretary may exclude from the critical habitat any area, the exclusion of which, would be more beneficial than harmful, he or she must designate any area without which the species would become extinct. 16 U.S.C. Sec. 1533(b)(2). This mandate conflicts with the requirements of NEPA because in cases where extinction is at issue, the Secretary has no discretion to consider the environmental impact of his or her actions.
 
 
 55
 Congress also made an implicit choice to accept the Secretary's policy not to prepare EISs when designating critical habitats. This choice is added evidence that Congress did not intend NEPA to apply to critical habitat designations. In 1988, Congress amended the ESA again. Though it addressed other parts of Sec. 1533 (Sec. 4 of the ESA), Congress did not change the critical habitat provisions. This inaction is significant because before the 1988 amendments, in 1981, the Sixth Circuit in Pacific Legal Foundation, 657 F.2d at 835, held that NEPA did not apply when the Secretary listed a species as threatened or endangered under the ESA and suggested in dicta that the process of designating a critical habitat might provide the "functional equivalent" of an EIS.[10]
 
 
 56
 More importantly, in 1983, the Secretary announced in the Federal Register his decision not to prepare EAs (and, therefore, EISs) before making critical habitat designations. 48 Fed.Reg. 49,244 (1983). In the 1988 amendments, Congress did not respond to this interpretation of Sec. 1533. "[W]hen Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the 'congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress.' " Commodity Futures Trading Comm'n v. Schor, 478 U.S. 833, 846, 106 S.Ct. 3245, 3254, 92 L.Ed.2d 675 (1986) (quoting NLRB v. Bell Aerospace Co., 416 U.S. 267, 274-75, 94 S.Ct. 1757, 1761-62, 40 L.Ed.2d 134 (1974)); see also Merrell, 807 F.2d at 779.
 
 
 57
 Douglas County argues that the legislative history of the ESA is not comparable to that of FIFRA. The County relies primarily on a statement in the Conference Committee Report for the 1978 ESA amendments which requires that actual notice of the critical habitat designation and "any environmental assessment or environmental impact statement" be supplied to affected local governments. H.Conf.Rep. No. 1804, 95th Cong., 2d Sess., 27 (1978), reprinted in 1978 U.S.C.C.A.N. 9484, 9494. The statement is far from a clear, considered indication of congressional intent. The comment does not direct the Secretary to prepare an EA or an EIS, it just states that if one is available, it should be forwarded. In light of the fact that this language did not become part of the final statute, and in light of the rest of the legislative history, we think this phrase does not indicate that Congress intended NEPA to apply to ESA critical habitat designations.
 
 
 58
 The district court, finding that Congress intended NEPA to apply to critical habitat designations, made much of the debate on the Senate floor over the 1978 amendments. See Douglas County, 810 F.Supp. at 1483. If that debate demonstrates anything to us, it demonstrates that though the Senate considered amending the ESA to state clearly that NEPA applied to ESA critical habitat designations, Congress chose not to make that statement.
 
 
 59
 The County argues that Jones v. Gordon, 792 F.2d 821 (9th Cir.1986) should control our analysis regarding NEPA's applicability. Jones, involved Sea World's application for a permit under the Marine Mammal Protection Act to take ten killer whales from the wild. Jones carries the torch of Flint Ridge, 426 U.S. at 788, 96 S.Ct. at 2438, finding no "irreconcilable conflict" between NEPA and the Marine Mammal Protection Act. Jones, 792 F.2d at 825. But in Jones we do not state that the finding of an irreconcilable statutory conflict is the only way to avoid the NEPA provisions, and it is unclear from the opinion whether the plaintiffs advanced other theories. Moreover, this court, in Merrell, joined the Sixth Circuit in Pacific Legal Foundation, 657 F.2d at 835, in finding that the "irreconcilable conflict" test did not afford the only exception to the application of NEPA to federal actions. Therefore, we find that Jones does not control.
 
 
 60
 As for the concern that if the Secretary is not subject to the NEPA requirements, he or she will have unchecked discretion in making critical habitat designations, we believe that the procedural requirements of the ESA, combined with review of decisions possible under the Administrative Procedure Act, are adequate safeguards.[11]
 
 
 61
 b. NEPA does not Require an EIS for Actions that Preserve the Physical Environment.
 
 
 62
 Even if the legislative history suggesting that Congress intended that the ESA procedure for designating a critical habitat displace the NEPA requirements were not as clear, the Secretary would still not be obliged to prepare an EIS when he or she designated a critical habitat under the ESA. We find that the NEPA procedures do not apply to federal actions that do nothing to alter the natural physical environment.
 
 
 63
 When we consider the purpose of NEPA in light of Supreme Court guidance on the scope of the statute, we conclude that an EA or an EIS is not necessary for federal actions that conserve the environment.[12] The purpose of NEPA is to "provide a mechanism to enhance or improve the environment and prevent further irreparable damage." Pacific Legal Foundation, 657 F.2d at 837. To this end, NEPA mandates an EIS report describing the "environmental impact" of significant federal actions, 42 U.S.C. Sec. 4332(2)(C).
 
 
 64
 The Supreme Court discussed the NEPA requirements in Metropolitan Edison Co. v. People Against Nuclear Energy, 460 U.S. 766, 772-73, 103 S.Ct. 1556, 1560-61, 75 L.Ed.2d 534 (1983). The Court emphasized that the adjective "environmental" implies that "NEPA does not require the agency to assess every impact or effect of its proposed action, but only the impact or effect on the environment." Id. at 772, 103 S.Ct. at 1560 (emphasis in original). The Court added that Congress meant the physical environment--the air, land, and water. The Court concluded that "although NEPA states its goals in sweeping terms of human health and welfare, these goals are ends that Congress has chosen to pursue by means of protecting the physical environment." Id. at 773, 103 S.Ct. at 1561 (emphasis in original) (footnote omitted).
 
 
 65
 If the purpose of NEPA is to protect the physical environment, and the purpose of preparing an EIS is to alert agencies and the public to potential adverse consequences to the land, sea or air, then an EIS is unnecessary when the action at issue does not alter the natural, untouched physical environment at all.
 
 
 66
 Other courts have reached the same conclusion. In Sabine River Auth. v. U.S. Dept. of Interior, 951 F.2d 669 (5th Cir.1992), cert. denied sub nom, Texas Water Conservation Ass'n v. Dept. of the Interior, --- U.S. ----, 113 S.Ct. 75, 121 L.Ed.2d 40 (1992), the Fifth Circuit found that no EIS was necessary when the federal government acquired a negative easement that prohibited the commercial development of certain wetlands in Texas. The court found that the Secretary did not need to prepare an EIS even though the easement would forever prevent the plaintiffs from constructing a reservoir: "The acquisition of a negative easement which prohibits development does not result in the requisite 'change' to the physical environment." Id. at 680. As another court put it, an EIS is not required "in order to leave nature alone." National Ass'n of Property Owners v. U.S., 499 F.Supp. 1223, 1265 (D.Minn.1980), aff'd, State of Minnesota v. Block, 660 F.2d 1240 (8th Cir.1981).
 
 
 67
 The district court ruled against the defendants on this issue, but its treatment of the argument is unpersuasive. The district court found that the argument--that EISs are not required for federal actions that maintain the environmental status quo--could not be determinative, no matter its merits, because it assumed a fact not in evidence. That fact was, that the environment would remain unchanged if designated a critical habitat. The court offered as an example the possibility that the area could acquire more old growth characteristics if it were left alone.
 
 
 68
 The district court missed the point. Of course a forest, free of human interference, changes all the time--saplings grow, mature trees die, dead trees decay. The touchstone is not any change in the status quo, but change effected by humans. Headwaters argues, and we agree, that when a federal agency takes an action that prevents human interference with the environment, it need not prepare an EIS. The environment, of its own accord, will shift, change, and evolve as it does naturally.[13]
 
 
 69
 c. ESA Furthers Goals of NEPA Without Requiring an EIS.
 
 
 70
 We also find that NEPA does not apply to the designation of a critical habitat because the ESA furthers the goals of NEPA without demanding an EIS. NEPA was designed to "promote human welfare by alerting governmental actors to the effect of their proposed actions on the physical environment," Metropolitan Edison, 460 U.S. at 772, 103 S.Ct. at 1560, and "to provide a mechanism to enhance or improve the environment and prevent further irreparable damage." Pacific Legal Foundation, 657 F.2d at 837. The ESA is a substantive statute whose goal is to prevent extinction: "[t]he plain intent of Congress in enacting [the ESA] was to halt and reverse the trend toward species extinction, whatever the cost." Tennessee Valley Auth. v. Hill, 437 U.S. 153, 184, 98 S.Ct. 2279, 2297, 57 L.Ed.2d 117 (1978). By designating critical habitats for endangered or threatened species, the Secretary "is working to preserve the environment and prevent the irretrievable loss of a natural resource." Pacific Legal Foundation, 657 F.2d at 837. Thus the action of the Secretary in designating a critical habitat furthers the purpose of NEPA. Requiring the EPA to file an EIS "would only hinder its efforts at attaining the goal of improving the environment." Id.
 
 
 71
 The district court found that this rationale, which the Sixth Circuit applied in Pacific Legal Foundation, 657 F.2d at 835-40, does not hold in the instant case. In Pacific Legal Foundation, the Sixth Circuit gave four reasons why NEPA should not be applied to the Secretary's decision to list species as endangered or threatened under the ESA. We think the analysis applies directly to the facts of the case before us.
 
 
 72
 First, the court in Pacific Legal Foundation, 657 F.2d at 835-36, found that if NEPA is applied to the listing of a species the ESA's purpose would be frustrated because the ESA prevents the Secretary from considering environmental impact when listing a species as endangered or threatened. In critical habitat designations the Secretary can only consider "economic impact and any other relevant impact of specifying any particular area as critical habitat." 16 U.S.C. Sec. 1533(b)(2). The district court decided that the ESA would not be frustrated by the imposition of NEPA because the language--"any other relevant impact"--could allow the "wide range of impacts required to be analyzed in preparing NEPA documentation." Douglas County, 810 F.Supp. at 1479.
 
 
 73
 The district court did not explain how it decided that the words of the statute were to be given such a broad meaning, and we think its interpretation is misguided. The other impacts that the Secretary may consider must be "relevant" to the designation process. The purpose of the ESA is to prevent extinction of species, and Congress has allowed the Secretary to consider economic consequences of actions that further that purpose. But Congress has not given the Secretary the discretion to consider environmental factors, other than those related directly to the preservation of the species. The Secretary cannot engage in the very broad analysis NEPA requires when designating a critical habitat under the ESA.
 
 
 74
 The second conclusion of the Sixth Circuit in Pacific Legal Foundation, 657 F.2d at 836, is that it would not further the purposes of NEPA to apply NEPA to the ESA because the Secretary does not have discretion to consider factors other than those listed in the ESA when listing a species. As with the first argument, the district court found in the instant case that because the Secretary can consider "any other relevant impact" when designating a critical habitat, that he or she has the authority to consider the impact on the environment. As we explained above, we do not agree with this broad interpretation.
 
 
 75
 The third basis for the court's decision in Pacific Legal Foundation was that "the Secretary's action in listing a species as endangered or threatened furthers the purpose of NEPA even though no impact statement is filed." Pacific Legal Foundation, 657 F.2d at 837. We agree. As with the decision to list a species under the ESA, the decision to preserve critical habitat for a species protects the environment from exactly the kind of human impacts that NEPA is designed to foreclose.
 
 
 76
 The district court found otherwise, stating that in the Ninth Circuit "NEPA applies to every major federal action absent a clear and unavoidable statutory conflict." Douglas County, 810 F.Supp. at 1482. We do not think this is an accurate description of Ninth Circuit law. In Merrell, 807 F.2d at 778, for instance, we found that NEPA did not apply to FIFRA, not because there was an unavoidable conflict between the statutes, but because the legislative history showed that Congress did not intend for NEPA to apply.
 
 
 77
 Fourth, the court in Pacific Legal Foundation, 657 F.2d at 840, found that the legislative histories of NEPA and the ESA indicate that Congress did not intend that the Secretary prepare an EIS before listing a species as endangered or threatened under the ESA. As we discuss in part III.B.2.a., supra, the legislative histories of NEPA and the ESA likewise indicate that Congress did not intend that the Secretary file an EIS before designating a critical habitat. In sum, we find that the analysis in Pacific Legal Foundation applies to the instant case, and that to apply NEPA to the ESA would further the purposes of neither.
 
 IV. CONCLUSION
 
 78
 We find that Douglas County does have standing to challenge the Secretary's decision not to prepare an EIS before designating the Northern Spotted Owl critical habitat, based on its procedural injury. On the merits, we find that NEPA does not apply to the Secretary's decision to designate a habitat for an endangered or threatened species under the ESA because (1) Congress intended that the ESA critical habitat procedures displace the NEPA requirements, (2) NEPA does not apply to actions that do not change the physical environment, and (3) to apply NEPA to the ESA would further the purposes of neither statute.
 
 
 79
 This conclusion is as consistent with legal precedent as it is with sound policy. The old growth forests and the species that inhabit them are unique resources that deserve protection. We are reluctant, as was the Sixth Circuit in Pacific Legal Foundation, 657 F.2d at 838, to make NEPA more of an "obstructionist tactic" to prevent environmental protection than it may already have become. Affirmed in part, reversed in part, and remanded for consideration consistent with views here and above expressed.
 
 
 80
 Each side to bear their own costs of suit.
 
 
 
 *
 The Honorable James M. Fitzgerald, Senior United States District Judge for the District of Alaska, sitting by designation
 
 
 [1]
 The Fish and Wildlife Service (FWS) is an entity within the Department of the Interior. To avoid confusion regarding the parties, in this opinion we will attribute any FWS action to the Secretary of the Interior (the Secretary)
 
 
 [2]
 The new Secretary of the Interior, Bruce Babbitt, has replaced Manuel Lujan as a defendant in this litigation
 
 
 [3]
 Ninth Circuit cases also have found that procedural injury can form the basis for standing. See Pacific Northwest Generating Coop. v. Brown, 25 F.3d 1443, 1450 (9th Cir.1994) (plaintiffs with an economic interest in preserving salmon have procedural interest in ensuring that the ESA is followed); Friends of the Earth v. United States Navy, 841 F.2d 927, 931-32 (9th Cir.1988) (residents who live near site of proposed port have procedural standing to sue for Navy's alleged failure to follow permitting regulations); State of California v. Block, 690 F.2d 753, 776 (9th Cir.1982) (state of California has procedural standing to challenge the adequacy of an EIS for forest service's land allocation); City of Davis v. Coleman, 521 F.2d 661, 671 (9th Cir.1975) (city located near proposed freeway interchange has procedural standing to challenge agency's failure to prepare an EIS)
 
 
 [4]
 It is unclear whether this "procedural right" must be conferred by a statute, or whether the right arises because a concrete interest is threatened. In Lujan, the Court discusses the "citizen-suit" provisions of the ESA which allow certain persons to sue and thus gives them a procedural right to ensure that statutory procedures are followed correctly. Lujan, 504 U.S. at ----, 112 S.Ct. at 2142. But in footnote seven, the Court states that people living near a proposed dam have procedural standing to challenge the agency's failure to prepare an EIS. The Court does not mention any statute that gives them their "procedural right." The Court seems to base its conclusion on the fact that people living close to a proposed dam have "concrete interests" that give them the right to insure that agencies follow correct procedures
 In some of our cases we have granted standing based on a "procedural right" conferred by statute. In Coleman, 521 F.2d at 672; and in Block, 690 F.2d at 776, we conferred standing based on NEPA's provision that certain government entities have a procedural right to participate in the NEPA process. But in Friends of the Earth, 841 F.2d at 931-32; in Pacific Northwest, 25 F.3d at 1449; and in a different passage in Coleman, 521 F.2d at 671, we do not discuss whether the challenged statutes confer a procedural right on the plaintiffs. There, we assumed that plaintiffs with separate "concrete interests" in the environment have a right to see that applicable procedures are properly followed.
 Because some of our cases and some language in Lujan require that plaintiffs have a right conferred by the challenged statute, we require that showing in this case.
 
 
 [5]
 The district court was correct to equate the "geographic nexus" test of past Ninth Circuit cases with the "concrete interest" test of Lujan, 504 U.S. at ---- n. 8, 112 S.Ct. at 2143 n. 8. See Douglas County, 810 F.Supp. at 1477
 
 
 [6]
 Lujan, 504 U.S. at ---- n. 7, 112 S.Ct. at 2142 n. 7, states that consequences of a challenged action are adequate for standing even when they occur in the far future, but it does not address how high the probability of their occurrence must be. When the dam of Lujan 's footnote seven is finally built, it likely to cause the environmental harm that the plaintiffs allege. In Pacific Northwest, 25 F.3d at 1449, however, we suggested that causation need only be established with "reasonable probability." We think that it is "reasonably probable" that the designation of the critical habitat would affect adjoining lands
 
 
 [7]
 Courts have discussed "categorical exceptions" to NEPA that do not apply in the instant case. See, e.g., Pacific Legal Foundation, 657 F.2d at 834 n. 4 (actions under the Clean Air Act are categorically exempt from NEPA); Jones v. Gordon, 792 F.2d 821, 827 (9th Cir.1986) (discussing a categorical exemption from NEPA for permits under the Marine Mammal Protection Act)
 
 
 [8]
 The County argues that because defendants did not raise the issue of statutory displacement in lower court, they may not do so on appeal. We disagree. Though in the district court, the defendants did not argue that the process of designating a critical habitat replaced NEPA, there is no bar to their raising new arguments on appeal if those arguments are purely legal. A court of appeals has the discretion to consider those new theories. See Telco Leasing, Inc. v. Transwestern Title Co., 630 F.2d 691, 693 (9th Cir.1980)
 
 
 [9]
 The language in the 1978 House Bill regarding designation of critical habitat eventually became the law in ESA Sec. 4(b), 16 U.S.C. Sec. 1533(b)
 
 
 [10]
 Courts have used a "functional equivalent" test to exempt agency action from NEPA requirements. In Pacific Legal Foundation, 657 F.2d at 835, the Sixth Circuit suggested that the "ESA may now provide the functional equivalent of an impact statement when a critical habitat is designated." Other courts have used the same analysis. See Environmental Defense Fund, Inc. v. EPA, 489 F.2d 1247, 1256 (D.C.Cir.1973) (finding FIFRA procedures to be the functional equivalent of NEPA); Getty Oil Co. v. Ruckelshaus, 467 F.2d 349, 359 (3rd Cir.1972) (Clean Air Act procedure should be used instead of NEPA), cert. denied, 409 U.S. 1125, 93 S.Ct. 937, 35 L.Ed.2d 256 (1973). The defendants here do not advance the functional equivalent argument, so we do not address it. The County would have us believe that the "displacement" argument defendants make is the same as the "functional equivalent" test. We do not agree. The "displacement" argument asserts that Congress intended to displace one procedure with another. The "functional equivalent" argument is that one process requires the same steps as another
 
 
 [11]
 Plaintiffs can challenge the Secretary's compliance with the ESA's procedural requirements under the APA, 5 U.S.C. Secs. 551, et seq
 
 
 [12]
 Amici Timber argue that if an EIS is not required for a designation of critical habitat, that the Secretary must prepare an EA, the document that explores whether an EIS is necessary. This line of reasoning is specious. If it is clear that an EIS is never necessary when the Secretary designates a critical habitat under the ESA, then an EA would not serve any purpose
 
 
 [13]
 Amici Timber argue that NEPA requires an EIS even for actions that maintain the status quo. Though the cases amici Timber cite do involve actions that, at least in part, preserve the environment, they are inapposite. The parties in those cases only challenged whether the agency adhered properly to the NEPA procedures. They did not challenge the applicability of NEPA to the contested actions. They apparently assumed that NEPA was applicable. See Hovsons, Inc. v. Secretary of the Interior, 711 F.2d 1208 (3rd Cir.1983) (management plan for national reserve); County of Josephine v. Watt, 539 F.Supp. 696 (N.D.Cal.1982) (designation of a river under the Wild and Scenic Rivers Act); Hogan v. Brown, 507 F.Supp. 191 (W.D.Ark.1980) (acquisition of land for wildlife refuge), aff'd, 665 F.2d 849 (8th Cir.1981). We cannot interpret a court's discussion of an EIS as an endorsement of the necessity for an EIS in cases where its necessity was not questioned
 Amici Timber also cite Confederated Tribes and Bands of the Yakima Indian Nation v. FERC, 746 F.2d 466, 476 (9th Cir.1984), cert. denied, 471 U.S. 1116, 105 S.Ct. 2358, 86 L.Ed.2d 259 (1985), for the proposition that the relicensing of a hydroelectric plant requires an EIS even though it maintains the status quo. The case is inapposite because there was a serious question about the impact on fish populations from the continued operation of the hydropower project. This kind of environmental damage is exactly what the spotted owl critical habitat designation does not threaten. In addition, we recently decided that actions that do not change the status quo do not require an EIS. See National Wildlife Federation v. Espy, 45 F.3d 1337, 1343-44 (9th Cir.1995).